### UNIVERSAL AVIATION UNDERWRITERS,
#### Plaintiff,

v.

### UNITED STATES of America,
#### Defendant.

#### Civ. A. No. 76–K–1134.

United States District Court,
D. Colorado.

Aug. 7, 1980.

---

David McDonald, McDonald & McDonald, Miami, Fla., and W. Robert Ward, Weller, Freidrich, Hickish & Hazlitt, Denver, Colo., for plaintiff.

Joseph F. Dolan, U. S. Atty., Denver, Colo., Robert W. King, Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D.C., and Theron Gray, Office of the Chief Counsel, Federal Aviation Administration, U. S. Dept. of Transportation, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This action arises out of the midair collision between a DeHavilland Twin Otter owned by Rocky Mountain Airways and a Beechcraft Bonanza on June 28, 1974, at approximately 1406 Mountain Daylight Time (MDT). The midair collision occurred in clear weather within the Denver Terminal Control Area (TCA). Visibility extended to 40 miles. Jurisdiction is admitted and based upon 28 U.S.C. §§ 1346(b) and 2671, *et seq.*

The amount of damage involved is not in controversy. The plaintiff as subrogee of Rocky Mountain Airways seeks damages for funds paid to or on behalf of Rocky Mountain Airways under the terms of a hull insurance policy for a stipulated amount of $254,500.

The issues of law to be decided are neither complex nor difficult. Colorado law governs. 28 U.S.C. § 1346(b), *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The United States has waived immunity for the negligent acts or omissions of government employees and is liable therefore in accordance with the Federal Tort Claims Act. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The United States has consented to be sued for the negligence of FAA air traffic control personnel. *Eastern Airlines v. Union Trust Co.*, 221 F.2d 62 (D.C.Cir.1955), *aff'd* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796. The decision to operate air traffic control facilities is a legislative one for which the negligent operation thereof subjects the United States to liability. The controlling case in this circuit is *Yates v. United States*, 497 F.2d 878, 884 (10th Cir. 1974). *See also Rudelson v. United States*, 431 F.Supp. 1101, 1107 (C.D.Cal. 1977).

The claim here asserted is against the United States for the negligent failure of the Denver control tower personnel to comply with the requirements of the terminal control area concept and provide positive separation between the aircraft which were involved in the mid-air collision. Plaintiff claims the proximate cause of the mid-air collision and the damage to the Rocky Mountain aircraft was the negligence of the FAA agents and employees in the Denver control tower.

The defendant claims that the proximate cause of the crash was the failure of the pilots of the Rocky Mountain Airways Twin-Otter and the pilot of the Beechcraft Bonanza, to comply with the applicable federal aviation regulations to see and avoid other aircraft. Defendant further claims the pilot of the Beechcraft Bonanza N8105R failed to comply with the federal aviation regulation in that he operated his aircraft contrary to air traffic control instructions.

The following facts were established by admissions in pleadings or by stipulation of counsel:

1. A mid-air collision occurred between N23RM, a DeHavilland Twin-Otter aircraft, owned by Rocky Mountain Airways, Inc. and N8105R, a Beechcraft Bonanza operated by Allen K. Heacock, on June 28, 1974 at approximately 1406 Mountain Daylight Time; the collision occurring within the Denver Terminal Control Area.

2. The weather at the time of the mid-air collision was clear with visibility of forty miles.

3. The essential tape recorded conversations pertaining to the collision were on the same radio frequency and are as follows:

L E G E N D

| | |
|---|---|
| 801K | – Beech King Air N801K |
| LC–A | – Local Control Arrival Position |
| 430 | – Cessna 180 N52430 |
| 323 | – Rocky Mountain Airways Twin Otter Flight 323 |
| 05R | – Beech Bonanza N8105R |
| Unk | – Unknown source |
| 980 | – Braniff International Flight 980 |
| 423 | – Western Airlines Flight 423 |

| Time | Source | Content |
|---|---|---|
| 2002:08 | 801K | Denver Tower, King Air zero one Kilo is left downwind for eight left |
| 2002:12 | LC–A | King Air eight zero one Kilo, roger, make your downwind at or south of the Interstate, maintain seven thousand till you cross the north-south runway |
| 2002:20 | 801K | Zero one Kilo |
| 2002:49 | 430 | Stapleton Tower, Cessna five two four three zero, Broadway inbound, would like a low approach and right outbound for another touch (remainder unintelligible) |
| 2002:56 | LC–A | Cessna four three zero, cleared for a low approach runway eight right, wind zero three zero degrees at one zero, I'll advise on your pull-up |
| 2003:02 | 430 | Four three zero |
| 2003:05 | LC–A | Braniff nine eighty, ground point niner |
| 2003:06 | 980 | Right |
| 2003:14 | LC–A | Zero one Kilo, turn left to a heading of two one zero, for vectors to the Interstate. You're too far north |
| 2003:18 | 801K | Okay, turning to two one zero |
| 2003:23 | LC–A | Zero one Kilo, descend to pattern altitude, report leaving six thousand five hundred, over |
| 2003:28 | 801K | Zero one Kilo is out of seven for lower now |
| | LC–A | Roger |

| Time | Source | Content |
|---|---|---|
| 2003:33 | LC–A | Zero one Kilo, when you cross the Interstate fly that for your downwind |
|  | 801K | Zero one K |
| 2003:38 | 323 | Rocky Mountain three twenty-three is with you |
| 2003:43 | LC–A | Aah, November zero five Romeo or Rocky Mountain three twenty-three? |
| 2003:47 | 323 | Rocky Mountain three twenty-three is with you |
| 2003:50 | LC–A | Rocky Mountain three twenty-three, roger, ah, reduce to approach speed, you're number two following the King Air about to cross the north-south runway |
| 2003:55 | 323 | Allright, sir, we're looking there, we're at seven thousand |
| 2003:58 | LC–A | Roger, descend to pattern altitude |
| 2004:00 | 323 | Okay |
| 2004:02 | LC–A | King Air zero one Kilo cleared to land runway eight left, wind zero five zero degrees at one two, make a short approach |
| 2004:08 | 801K | Zero one Kilo, wilco |
| 2004:12 | 05R | Denver Tower, zero five Romeo, level at seven thousand |
| 2004:15 | LC–A | November zero four, zero five Romeo, roger, ah, do you have the King Air to your left and below you in sight? |
| 2004:23 | Unk | Both |
| 2004:24 | LC–A | Zero five Romeo, fly northbound for now |
| 2004:28 | 05R | Zero, five Romeo ––––– have him in sight |
| 2004:31 | LC–A | Okay, turn downwind behind him, you follow him, you're, ah, number three |
| 2004:37 | 05R | Zero five Romeo |
| 2004:40 | LC–A | Rocky Mountain three twenty-three, number two following a, ah, Rocky Mountain, correction, a King Air just turning base. Do you have him in sight now? |
| 2004:46 | 323 | No sir, we sure don't. We're level sixty-five hundred |
| 2004:49 | LC–A | Roger |
| 2004:52 | LC–A | November zero five Romeo number three, following a Rocky Mountain Otter ahead and to your left straight in. |
|  | Unk | Okay |
| 2004:59 | 323 | Mountain three twenty-three, we got the King Air now |
| 2005:02 | LC–A | Roger, follow him for runway eight left. Cleared to land |
| 2005:04 | 323 | Roger |
| 2005:05 | LC–A | Zero five Romeo, do you have the Rocky Mountain Otter in sight? |
| 2005:08 | 05R | Not yet |
| 2005:09 | LC–A | Okay, extend downwind. Will advise when to turn base. |
| 2005:19 | LC–A | November four three zero, after completion of low approach make a right turn southbound, climb and maintain six thousand five hundred, over |
| 2005:25 | 430 | Four three zero |
| 2005:28 | 423 | Denver Tower, this is Western four twenty-three, just turning final |
| 2005:31 | LC–A | Western four twenty-three cleared to land runway eight right, wind zero five zero degrees at one five |
| 2005:36 | 423 | Okay, thank you |
| 2005:43 | LC–A | Zero five Romeo, do you see that, ah, Otter now? |
| 2005:47 | 05R | Affirmative |
| 2005:48 | LC–A | Okay, follow him for runway eight left. Traffic ahead and to your right is for eight right, jet traffic. Caution, wake turbulence |
| 2005:53 |  | ELT Transmission overriding other communications at this position on the recording. |

The contested issues to be decided are whether there was negligence on the part of defendant's agents and, if so, was such negligence a proximate cause of the collision and resulting damage to plaintiff. Necessarily the findings of fact required to resolve the issues are extensive and sufficiently complicated to confuse those of us who already stand in awe of the intricacies of flying and in trepidation of its consequences. Relying upon the considerable skill and assistance of counsel who are recognized specialists in the field, I have reviewed the transcript of testimony and examined all exhibits admitted in evidence. On this basis I find the following facts to be proven by a preponderance of the evidence:

1. Dr. Allen K. Heacock was the pilot and sole occupant of Beechcraft Bonanza N8105R (hereinafter "BONANZA") and he possessed a commercial pilot's license with approximately 240 hours flying time.

2. At the time of the collision the pilot, seated in the right seat as co-pilot, operating the controls of the Rocky Mountain Airways' DeHavilland DHC–6 Twin Otter aircraft (hereinafter "OTTER") was Terrance M. Sargent. He holds an airline transport pilot's rating in single and multi-engine aircraft, a flight instructor's rating and a commercial pilot and instrument rating with approximately 5,000 hours flying time. The pilot occupying the left seat in the cockpit and acting as co-pilot on the flight was Douglas Deveraux. The pilot and co-pilot alternated duties during the course of the day with one of them flying the aircraft while the other assisted. A flight crew usually flew five round trips per day between Denver and localities in the mountainous area of Colorado, operating approximately two hours per day in the Denver TCA where they were fully familiar with the services rendered by the FAA air

traffic control center. At the time of the collision the OTTER was returning to Denver from Steamboat Springs with 10 passengers. This was the third round trip for the day. The OTTER was on a company filed flight plan and was operating under visual flight rules as it approached the Denver area from the west northwest. Weather was clear and the visibility was good. On approaching Denver the OTTER crew obtained pertinent information relative to the Denver area by listening to the AUTOMATIC TERMINAL INFORMATION SERVICE recording (hereinafter "ATIS") and thereafter contacted Denver Approach Control on the appropriate radio frequency.

3. At the time of the collision the Stapleton Airport was located within a Group II Terminal Control Area. Applicable federal air regulations required aircraft to obtain approach control permission to enter the terminal control area (hereinafter "TCA").

4. The FAA established certain busy airports as Terminal Control Areas because of the recognized need for better control of aircraft operating near busy airports to maintain operational safety.

5. The crew of the OTTER complied with the applicable federal air regulations and contacted Denver Approach Control which gave instructions relative to their entrance into the TCA, their rate of descent and directions for a straight-in approach to Runway 8L at Stapleton Airport. The controller confirmed radar contact with the OTTER by having them "squawk" an individually assigned code on the OTTER'S transponder. This device specifically identified that aircraft to the controller on the radar scope and the OTTER crew was advised that radar contact had been confirmed. As the OTTER crew complied with the instructions provided by the Denver Approach Control they were turned over to a Mr. John D. Kayartz, a trainee under the supervision, direction and control of Quentin J. Gates, a fully qualified journeyman air traffic controller. This local control position in the tower controlled aircraft landing at Stapleton Airport.

6. Mr. Kayartz instructed the OTTER to follow a Beech King Air which was on a short final to Runway 8L and sequenced the OTTER as Number Two to land behind the King Air. When the OTTER crew visually located the King Air they found themselves to be appropriately spaced by Mr. Kayartz for a safe landing on Runway 8L and upon notifying the tower that they had the King Air in sight, they were *cleared to land* behind the King Air by Mr. Kayartz.

7. Meanwhile, Dr. Allen K. Heacock was headed generally northbound toward Stapleton Airport, in a rented BONANZA, enroute from Amarillo, Texas, after having made a stop at Salida, Colorado where his family disembarked. He also obtained the appropriate information from the ATIS, contacted Denver Approach Control and was instructed to fly over the airport on a generally north heading at an altitude of 7,000 feet. When approximately over the airport the BONANZA was instructed to contact the air traffic controller handling the local control position. Upon doing so Mr. Kayartz asked if he had "the King Air to your left and below you in sight" and when Dr. Heacock acknowledged sighting that aircraft Mr. Kayartz instructed the BONANZA,

"O.K., turn downwind behind him, *you* follow him, your, ah, Number Three."

Mr. Kayartz then instructed the OTTER that it was Number Two following the King Air. The instructions given to the King Air to "make a short approach" resulted in the King Air making what amounted to a 180 degree descending left turn from a generally westerly heading at a position north of and parallel to Runway 8L to a compass heading of south and on around to the east and finally to the runway heading of 80 degrees. Dr. Heacock, in the BONANZA, having been instructed to follow the King Air generally paralleled the beginning of the arc as the King Air began to turn to the south as he looked for the "Rocky Mountain OTTER" which he was to follow to a landing. At 2005:05 Mr. Kayartz asked the BONANZA if it had the "Rocky Mountain OTTER in sight" and

when advised "not yet," advised the BONANZA, "O.K. extend downwind. Will advise when to turn base." Dr. Heacock in the BONANZA then straightened out his turn to the South and flew in an essentially southwesterly direction while continuing to look for the "Rocky Mountain OTTER" Mr. Kayartz had instructed him to follow. He noted the King Air over the end of the runway about to land and then saw a high wing aircraft which appeared to be behind the King Air at an appropriate distance for landing behind it. Dr. Heacock mistakenly assumed this high wing single engine aircraft, a Cessna 180 shooting a practice instrument approach to Runway 8R, was the "Rocky Mountain OTTER" which Mr. Kayartz had instructed him to follow.

8. While Dr. Heacock did not know what a "Rocky Mountain OTTER" was or looked like, he was not aware of any other aircraft in the area and had not been advised of any other traffic approaching Stapleton Airport from the west which he could have mistaken for the aircraft he was to follow so he did not seek more information about the "Rocky Mountain OTTER."

9. The ARTS III printout of the path of the various aircraft shows that the King Air, in making its short approach, actually made such a wide turn that it was all the way past the approach end of Runway 8R thus creating a condition where the Cessna 180 was directly "in trail" behind the King Air.

10. The parallel Runways 8 Right and 8 Left are approximately 900 feet apart, and due to their close proximity and the difference in altitude between the King Air and the following Cessna 180, it would not have been possible for Dr. Heacock to determine from his position northwest of the airport that one aircraft was actually heading for Runway 8 Left while the other was heading for Runway 8 Right.

11. The air traffic controllers never notified Dr. Heacock in the BONANZA or the crew of the OTTER of the presence and position of the Cessna 180 nor did they advise any of the aircraft in the area of said aircraft that the King Air had made such a wide turn that it was so far south of Runway 8 Left as to cause confusion about where it was going or which aircraft was following it.

12. At 2005:43 Mr. Kayartz inquired of the BONANZA "Zero Five Romeo, do you see that ah, OTTER now?" and upon receiving a response "affirmative," Mr. Kayartz instructed the BONANZA,

"O.K., follow him for Runway 8 Left, traffic ahead and to your left is for 8 Right, jet traffic. Caution, wake turbulence."

Dr. Heacock, believing that he was supposed to be following a "Rocky Mountain OTTER" which he believed to be a single engine aircraft due to the controller's failure to indicate that the OTTER was a twin engine aircraft, thought that he was supposed to be following the Cessna 180 which by this time was getting close to the approach end of the runway. Dr. Heacock felt that he had already gone so far west of the airport that he was going to lag excessively behind the aircraft he was supposed to follow, possibly causing further problems with following aircraft behind him, so he made a sharp and steep descending left turn in an effort to turn in quickly and position his aircraft behind the aircraft he believed to be the "Rocky Mountain OTTER" and thus close the gap.

13. While in the steep descending left turn and just before reaching a runway heading of 80 degrees, Dr. Heacock experienced a sharp jolt and temporarily lost control of his aircraft as a consequence of a collision with the OTTER. Dr. Heacock had been diligently scanning the surrounding airspace while scanning his instruments and preparing for a rapid turn and descent to landing. He never saw the OTTER because his course and altitude were such that the OTTER remained in the blind spot ahead and below him covered by the nose of the BONANZA. Considering the background and experience of Dr. Heacock and the facts and circumstances as developed immediately prior to the impact, Dr. Heacock was a victim of a series of circumstances which placed him in such a position and

at such an altitude that the blind spots on his aircraft continued to block his view of the "Rocky Mountain OTTER" as he turned toward the runway.

14. Because all communications with John D. Kayartz and the various aircraft were on the same radio frequency, the crew of the OTTER were aware that the BONANZA had been sequenced as Number Three to follow the OTTER while physically located somewhere north of the airport while headed in a westerly direction. The crew of the OTTER maintained vigilance for other aircraft at all times and expected the BONANZA to pass to the north of them while heading in a generally westerly direction before turning to the south and then to the east in behind the OTTER to follow it to landing. The OTTER crew rightfully expected the BONANZA to continue westbound while north of them under positive air traffic control, until appropriately spaced behind them.

15. At the time of the impact, the ARTS III printout of the radar picture of traffic displayed on the Britescope in the Denver tower to the air traffic controllers had indicated the BONANZA was traveling at a speed of approximately 140 knots for some distance and that the OTTER was traveling at approximately 90 knots. The pilot of the OTTER was making a slight left turn to line up with the landing runway just prior to the impact. As the aircraft was in the turn the blind spot caused by the left engine and high wing of the OTTER moved to the west thus enabling Captain Deveraux, seated in the left seat to see the BONANZA approaching from above and to the left rear in a descending left turn. Captain Deveraux immediately grabbed the control yoke and took evasive action by making a steep descending right turn.

16. Mr. Sargent who was flying the aircraft until that instant caught a glimpse of the BONANZA a split second before impact and noted that the BONANZA was in a descending steep left turn with its flaps and gear down overtaking the OTTER from above and from the left rear. Mr. Sargent was looking up at the bottom of the BO-

NANZA and could not see the pilot or cockpit area. The intersecting angle as the BONANZA's course intersected the OTTER's course was approximately fifty-three (53) degrees. Although controller John Kayartz did not see the actual impact, he had noted the last time he observed the aircraft prior to the impact that the BONANZA was above and behind the OTTER. The evasive action taken by Captain Deveraux was appropriate and, indeed, commendable.

17. The "right of way" rule as provided in Federal Air Regulations Part 91, Section 91.67 gives the right of way to the lower aircraft, to the aircraft on the right, and to a landing aircraft, all of which favored the OTTER which had actually been *cleared to land.* Under all the circumstances existing at the time, the crew of the OTTER could not be reasonably expected to foresee that the BONANZA would continue to turn from a westerly heading to the south and eventually to an easterly heading so as to overtake the OTTER from the left rear on an intersecting angle of approximately 53 degrees. The see and avoid principle simply does not apply.

18. The leading edge of the right wing of the BONANZA near the wing tip struck the trailing edge of the left wing of the OTTER while the BONANZA was in a steep descending left turn and the OTTER was in a steep descending right turn. The angle of convergence was such that the trailing edge of the left wing of the OTTER slid down the leading edge of the right wing of the BONANZA until it hit the right cowling of the BONANZA causing a vertical dent therein and a corresponding large round dent in the trailing edge of the left wing of the OTTER. The two aircraft then separated, both diving toward the ground. The Emergency Locater Transmitter of the BONANZA went off as a result of the impact.

19. Dr. Heacock was able to recover control of his aircraft and proceeded to a normal landing on Runway 8 Left. Due to the damage to the left wing the crew of the OTTER experienced extreme difficulty in

recovering control of the aircraft and were barely able to obtain control before reaching the ground. The damage to the left wing of the OTTER was so severe that it was difficult to maintain control. Therefore Captain Deveraux decided to make an emergency landing in a wheat field instead of the airport.

20. The Federal Aviation Administration under the Department of Transportation publishes an Airmen's Information Manual which provides information for pilots as a basic flight manual and to inform them of air traffic control procedures. In the introduction under the caption "FEDERAL AVIATION ADMINISTRATION" the manual provides, inter alia, that "The Federal Aviation Administration is responsible for insuring the safe and efficient use of the nation's airspace. . . ." and goes on to state "The activities required to carry out these responsibilities include: safety regulations, airspace management and the establishment, operation, and maintenance of a civil-military common system for air traffic control and navigation facilities; . . . ." Chapter I contains a glossary of aeronautical terms which includes the following:

AIR TRAFFIC CLEARANCE (Clearance)—An authorization by air traffic control for the purpose of *preventing collision* between *known* aircraft for an aircraft to proceed under specified traffic conditions within controlled airspace. (Emphasis added.)

TRAFFIC INFORMATION (Radar)—Information issued to alert an aircraft to any radar targets observed on the radar display which may be in such proximity to its position or intended route of flight to *warrant its attention.* (Emphasis added.)

21. Denver is described as a Group II TCA in the Airman's Information Manual (hereinafter AIM) and in describing "TERMINAL CONTROL AREA" states "A Terminal Control Area (TCA) consists of controlled airspace extending upward from the surface of higher to specified altitudes within which *all aircraft* are subject to operating rules. . . ."

22. In describing the "TERMINAL CONTROL AREA OPERATION" the AIM in a heading captioned "ATC CLEARANCES AND SEPARATIONS," provides "While operating within a TCA pilots are provided the service and separation as in the Stage III Terminal Radar Programs for VFR aircraft in this Chapter. In the event of a radar outage separation and sequencing of VFR aircraft will be suspended as this service is dependent on radar. The pilot will be advised that the service is not available. . . ." (AIM 1–33). Under the caption "Stage III Service (Radar Sequencing and Separation Service for VFR Aircraft)" it is stated: "The purpose of this service is to provide *separation* between all participating VFR aircraft and all IFR aircraft operating within the airspace defined as the Terminal Radar Service Area (TRSA)." (Emphasis added) AIM 1–32.

23. Under the caption "CLEARANCE," AIM provides:

(1). A Clearance issued by ATC is predicated on known traffic and known physical airport conditions. An ATC Clearance means an authorization by ATC for the purpose of preventing collisions between known aircraft, for an aircraft to proceed under specified conditions within controlled airspace. (AIM 1–48).

24. In the AIM, Part IV, in the section on Supplemental Data on Terminal Control Areas, it is provided:

"ATC PROCEDURES.

All aircraft will be controlled and separated by ATC while operating within a Group I or Group II TCA. VFR aircraft will be separated in accordance with Stage III Radar Service procedures."

This section further provides that "Although radar separation will be the primary separation standard used, approved visual separation and other non-radar procedures will be applied as required or deemed appropriate . . . In the event of a radar outage, separation and sequencing of VFR aircraft will be suspended as this service is dependent on radar. The pilot will be advised that this service is not available. . . ."

25. The Federal Aviation Administration publishes a manual 7110.8C entitled TERMINAL AIR TRAFFIC CONTROL which prescribes air traffic control procedures for use by personnel providing terminal air traffic control services. The forward provides that "Controllers are required to be familiar with the provisions of this handbook which pertain to their operational responsibility and to exercise their best judgment if they encounter situations not covered by it."

26. The Terminal Air Traffic Control Manual requires that the controller give first priority to the separation of aircraft and further requires that he issue " *instructions* as necessary to insure that the aircraft avoid each other." (Emphasis added.)

27. The Terminal Air Traffic Control Manual in Section 4 on Vectoring provides that controllers shall "vector aircraft when it is necessary for separation purposes, . . ." or when "IFR and VFR aircraft are within controlled airspace." The section of the manual dealing with "Terminal Control Area Procedures" directs that the controller shall apply the procedures at all TCA locations to separate all fixed wing aircraft, both VFR or IFR in accordance with the procedures and minima established for Stage III service, using language essentially the same as is contained in the information afforded to pilots in the AIM.

28. The FAA, in a Newsletter released September 30, 1969, when referring to its year long study of near mid-air collisions stated: "The study showed that approximately two-thirds of all 'hazardous near mid-air collisions' occurred in terminal airspace and identified two major causes as the uncontrolled mixture of VFR and IFR traffic and the difficulty of maintaining separation on a 'see and avoid' basis." The FAA has long been aware of the inadequacies of the "see and avoid" concept in congested airspace around airports where pilots are busy and the blindspots, inherent in aircraft design and construction, contribute, during certain maneuvers, to the cause of mid-air and near mid-air collisions.

29. At the time this incident occurred, Mr. Kayartz was standing in the control tower at Stapleton Airport which has windows around its entire perimeter. He was in visual contact with all of the relevant aircraft at all times material to the cause of action and was being assisted by and was under the direct control of Journeyman Controller Quentin Gates whose visibility was also unrestricted. Although Mr. Kayartz was moderately busy at the time, the number of aircraft he was attempting to handle was not a factor. James Rowan, the air traffic control specialist offered as an expert witness by the defendant candidly admitted that there was ample time for Mr. Kayartz to handle his workload and have time for a cup of coffee while doing so. Furthermore, there was a Britescope located immediately adjacent to the position where Mr. Kayartz was standing. The Britescope is a television reproduction of the radar scope located in the radar room. Each aircraft appears thereon with tags indicating its aircraft number and speed.

30. Air traffic controllers are taught to develop and use a repetitive scan technique wherein they look at the aircraft they are controlling out the window, the conditions in the immediate area of the aircraft as well as in the direction of their intended flight, the landing runway in use, the Britescope reproduction of the radar information and back out the window to the aircraft. This scan technique is necessary to keep abreast of all developments that are taking place and adequately, properly and safely to perform the duties of an air traffic control specialist working the local control position. The Britescope was working properly at the time of the incident. Had it been used properly by Mr. Kayartz and Mr. Gates or by either of them, it would have been readily apparent that the BONANZA was traveling at approximately 140 knots while overtaking the OTTER from the left rear at an intersecting angle of approximately 53 degrees, while the OTTER was only traveling at approximately 90 knots. Although Mr. Kayartz thought the BONANZA was sufficiently far behind and above the OTTER so that there was no

threat of a mid-air collision, the difficulty of accurate depth perception of different sized aircraft at different distances from the visual observer is recognized as a problem by air traffic control specialists and is one of the principal reasons why the Britescope is of significant value in determining aircraft locations, movements in relation to each other, and speeds. The failure to utilize properly and adequately the information available from the Britescope to supplement Mr. Kayartz's visual observations out the window of the tower constituted negligence which was a proximate cause of the accident in question in a Terminal Control Area where it was the controllers' duty to provide separation between aircraft operating within such defined airspace.

On the basis of the foregoing findings of fact, I conclude that the plaintiff has proved by a preponderance of the evidence that the defendant was negligent and that its negligence was a proximate cause of the damage sustained by plaintiff.

The Tenth Circuit has stated in *Yates v. United States*, 497 F.2d 878 at 882, 883 (10th Cir. 1974), *affg*. 370 F.Supp. 1088 (D.Colo.1976):

> The relationship between the air controller and the pilot of a plane which is landing or taking off creates a duty of care on the part of the controller. The government argues that plaintiff had no right to rely on instructions which the air controller gave him, and it was up to him to form his own judgment. We fail to see the controller's directions and warnings as being merely advisory. It is true that the regulations state that a pilot is directly responsible for and is the final authority as to the operation of the aircraft, and they also say that in an emergency the pilot may deviate from the regulations to the extent required to meet the emergency. He must, however, when he has deviated, send a written report of the deviation to the administrator upon request. What appears to be a conflict can be reconciled. A pilot has a choice before he commits himself to a landing, but after the commitment he is not free to change his course and thereafter he is controlled by the controller. Along this same line we note that 49 U.S.C. § 1430(a)(5) declares that it is unlawful for any person to operate aircraft in air commerce in violation of any other rule, regulation, or certificate of the Administrator. This supports our view that what appears to be a conflict between the regulation declaring that the pilot is in command of the aircraft and the regulations giving traffic control authority to the government controllers are consistent after all. This becomes clear in light of considering that if the pilot could depart from the control of the tower at any time in his discretion, the airfield traffic would soon become a shambles. We cannot, therefore, accept the view that the controllers with the complex equipment which they employ are there merely to give advice. The recognition of these functions as legal obligations gives rise to an attendant duty to perform these functions with reasonable care.

> At bar the pilot Yates was peculiarly susceptible to the control of the controllers since he was piloting a light plane in between heavy jets. Once he received and followed the controller's instructions with respect to landing he was not free to disregard the directions given and exercise independent initiative. For all practical purposes, he was in complete control of the tower. The hazardous traffic pattern, the direction which enhanced the danger and the failure to direct as to turbulence all contributed to the tragic result.

*Also see Deweese v. United States*, 419 F. Supp. 147 (10th Cir. 1978), *affg*. 576 F.2d 802 (D.Colo.1976), wherein Judge Winner reasoned essentially the same in holding the United States liable for the controllers failure to use reasonable care in performing his duties.

The Airman's Information Manual disseminated essentially the same information to pilots as the Terminal Air Traffic Control Manual "prescribes" as Air Traffic Control Procedures to personnel providing Terminal Air Traffic Control services. In

many instances the exact language is utilized for definitions and in explaining the services rendered to pilots. Pilots therefore have been induced to rely upon the services and in this case the testimony of Terry Sargent and Dr. Heacock clearly indicated that each of the pilots was relying on Mr. Kayartz to provide separation and spacing in the Terminal Control Area. They did not relax their vigilance in the VFR atmosphere. The testimony of each of these pilots establishes that each aircraft remained in a blind spot of the other until Mr. Deveraux saw the BONANZA in a left descending turn come out from behind the left wing and engine of the OTTER, and instituted evasive action.

The Terminal Air Traffic Control Manual specifically provides that as used in the Manual:

"Shall, or an action verb in the imperative sense, means a procedure is *mandatory*." (Emphasis added.)

The definitions section of the Controllers' Manual contains the following:

"AIR TRAFFIC CLEARANCE (Clearance). An authorization by air traffic control, for the purpose of *preventing collision* between *known* aircraft, for an aircraft to proceed under specified traffic conditions within controlled airspace." (Emphasis added.)

Both the OTTER and BONANZA were "known" aircraft, both were doing exactly what they were told to do by Mr. Kayartz and at the time of the mid-air collision the OTTER had been *cleared to land*. The controllers in issuing the clearance were not successful in "preventing collision between known aircraft."

The Forward to the Controllers' Manual provides:

"Controllers are *required* to be familiar with the provisions of this Handbook which pertain to their operational responsibility and to exercise their best judgment if they encounter situations not covered by it."

The negligent acts and omissions on the part of the controllers which were the proximate cause of this mid-air collision are covered in some detail by the provisions of the Controllers' Manual. In any event, the above language clearly establishes the standard of due care where specific provisions of the manual may be inadequate.

The facts do not support the government's contention that the pilots of the OTTER were negligent. All eye witnesses testified that the BONANZA overtook the OTTER from behind and above from a position where the pilots of the OTTER could not have seen it. The pilots of the OTTER had every reason to expect and anticipate that the BONANZA would continue to the west and turn in behind them for a landing behind them. They had no reason to anticipate or expect any danger unless advised or warned by the controller. The angle by which the BONANZA overtook the OTTER was found by the NTSB investigator to be approximately 53 degrees and was estimated by Mr. Sargent as being between 45 and 60 degrees, thus, confirming the impossibility of any negligence on the part of the OTTER crew.

It appears that this particular type of accident, that is, where each aircraft is in the blind spot of the other, is the very reason why the concept of "see and avoid" is inapplicable. TCAs were established to provide positive control, separation and spacing of aircraft while attempting to insure a smooth, safe and expeditious flow of traffic into and out of the airport.

Nor does it appear that Dr. Heacock was guilty of any negligence which was a proximate cause of the collision. He looked for and observed an aircraft which was directly behind the King Air in an "in-trail" position and which appeared to be following it for landing. He was approximately two miles away and could not be certain of what kind of an aircraft the Number Two aircraft (Cessna 180) was, although he could discern that it was a high wing aircraft. He was not told that it was a twin engine OTTER, was not aware that there were any other aircraft approaching the airport from the west which might be confused as the aircraft he was to follow

and was never given any information or advice that there was a Cessna 180 making a low approach to Runway 8 Right or that the King Air made a wide turn so as to be lined up directly in front of the Cessna. In view of the circumstances and the acts and omissions of the responsible controllers, Dr. Heacock's mistake in identifying the Cessna as the OTTER at the distance involved is so miniscule that I find it not to be actionable. Even if Dr. Heacock's conduct were a contributing cause to the occurrence of this mid-air collision, the plaintiffs are still entitled to judgment against the United States. The law of Colorado applies and Colorado follows the rule that joint tortfeasors are jointly and severally liable. Dr. Heacock is not a defendant in this action and was not joined as a defendant by the United States of America. Even if Dr. Heacock had been joined as a defendant and even if I were to find as a consequence thereof that his negligence contributed to the cause of the collision, there is no apportionment of damages between joint tortfeasors in Colorado. *Dunham v. Kampman*, 37 Colo.App. 233, 547 P.2d 263 (1975), *Martinez v. Stefanich*, Colo., 577 P.2d 1099 (1978).

■ Having undertaken the responsibility of exercising control of air traffic in the Denver Terminal Control Area as a Group II TCA, the United States must meet its responsibility according to the standard of due care and reasonableness based upon the requirements of the Federal Aviation Administration Air Traffic Procedures Manuals which set forth the functions and responsibilities of air traffic control personnel as well as upon reasonable pilot reliance on the government for a given service which the government has assumed. *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970); *Hartz v. United States*, 387 F.2d 870 (5th Cir. 1968).

■ The extent of the government's duty of due care does not rest within its own discretion. The government cannot circumscribe its own liability by limiting it to the letter of its own regulation, policies, manuals and directives. *Harris v. United States*, 333 F.Supp. 870 (N.D.Tex.1971).

Due care requires that air traffic controllers issue clearances in accordance with the air traffic control manuals. The clearances issued must be reasonably designed to insure the safety of aircraft flight. *Thibodeaux v. United States*, 14 Avi. 17,653 (E.D. Tex.1976); *Todd v. United States*, 384 F.Supp. 1284 (N.D.Fla.1973). Controllers must also warn of danger reasonably apparent to them even if not required by the manuals. *Spaulding v. United States*, 455 F.2d 222 (9th Cir. 1972).

The damages sustained by the plaintiff in the amount of $254,500 were proximately caused by negligence on the part of the United States of America acting by and through the FAA and its air traffic control specialists on duty in the Stapleton Tower at the time of the mid-air collision. Plaintiff therefore shall have judgment in its favor and against the defendant in the amount of $254,500 together with interest and costs herein expended.