Ishiro NAKAJIMA, as Personal Representative of the Estate of Keiji Nakajima, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 89–944–Civ.

United States District Court, S.D. Florida.

March 12, 1991.

Scott D. Sheftall and Robert C. Levine, Floyd, Pearson, Richman, Greer, Weil, Beumbaugh & Russomanno, P.A., Miami, Fla., for plaintiff.

Douglas Coleman, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C. (John Knudsen, Trial Atty., Litigation Div., F.A.A., of counsel), for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

This wrongful death action brought pursuant to the Federal Tort Claims Act, Title 28 United States Code Sections 1346(b), 2671 et seq., was tried five (5) days to the Court. The Court has considered all of the testimony offered, exhibits including, but not limited to the National Transportation Safety Board Report (Plaintiff's exhibit 27) and all exhibits offered by the parties, each respectively, at trial, memoranda of law, and having reviewed proposed post-trial findings of fact and conclusions of law submitted, each respectively, by plaintiff and defendant, and being otherwise fully advised in the premises, the Court herewith makes and enters its Findings of Fact and Conclusions of Law as follows:

### FINDINGS OF FACT

1. This wrongful death action is brought against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq.

2. The accident giving rise to this litigation occurred at the Opa Locka Airport, Opa Locka, Florida, on August 31, 1987 [Stipulated Fact].

3. The accident resulted from a mid-air collision between a Bell 47G helicopter, piloted by KEIJA NAKAJIMA, and a Cessna 152 [Stipulated Fact].

4. The helicopter carried registration number N6728D and the Cessna carried registration number N48864 [NTSB Factual Report, at 4, Plaintiffs' Exhibit (hereinafter "P.E.") 27; Rudich testimony, Excerpt of Trial Transcript, at page 17, lines 14–17 (hereinafter "Tr. page:lines") ].

5. KEIJI NAKAJIMA died on August 31, 1987, as a result of injuries sustained in a mid-air collision between the Bell 47G Helicopter (the "helicopter"), which he was piloting, and a Cessna 152 fixed wing aircraft (the "Cessna"). Both the helicopter and the Cessna were performing training exercises in patterns around the vicinity of the airport traffic area known as "Area Alpha" at the Opa Locka Airport, Opa Locka, Florida. The collision occurred in plain view of the Opa Locka Airport air traffic control tower when the Cessna performed a simulated "dead-stick" or power-off emergency landing procedure and cut off the helicopter in its normal "Alpha pattern". The Cessna overtook the helicopter from above and from the rear, in effect rear ending the helicopter from its "blind spot". The evidence admitted to reconstruct the accident, including pertinent and credible portions of the NTSB Factual Report and transcript of the tape of Tower Control transmissions with the aircraft, establishes that neither the helicopter nor the Cessna saw each other as the Cessna descended and came closer and closer until its nose strut shattered the helicopter's main rotor causing the helicopter to crash to the ground. The Cessna was able to land without injury to its occupants.

6. The control tower at Opa Locka Airport is operated by the Federal Aviation Administration, an agency of the United States. It operates on a part-time basis

and was operating at the time of the accident. (NTSB Factual report, P.E. No. 27, at p. 7)

7. Opa Locka Airport is host to numerous flight schools and was recognized by the tower personnel as a training facility (trial testimony of Moten, Wills and Brannon). The U.S. Coast Guard has a permanent facility utilizing Falcon Fan Jets and helicopters to support their search and rescue missions. (NTSB Factual Report, P.E. No. 27, at p. 82)

8. The Opa Locka tower is a level II VFR facility which operates the airport from 7:00 a.m. to 11:00 p.m. daily. (NTSB Factual Report, P.E. No. 27, at pp. 7 and 82).

9. Opa Locka Airport consists of six runways, three of which lie east/west, two north/south and one southeast/northwest. The longest runway is 9L. All runways are served by taxi ways. (NTSB Factual Report, P.E. No. 27, at pp. 7 and 82)

10. In addition to the Opa Locka Airport runways, certain area adjacent to the runways are designated for use by rotocraft (helicopters). (NTSB Factual Report, P.E. No. 27 at p. 7) Two of these helicopter pads are located in "Area Alpha" which is south of runways 09R.27L. *See* Excerpt from Flow Bulletin 20.

11. In addition to the local controller, Mr. Coy Moten, other tower personnel on duty on August 31, 1987 were Ms. Christine Brannon, in charge of flight data and Ms. Christy G. Wills, in charge of ground control/clearance delivery. (NTSB Factual Report, P.E. No. 27, at p. 85)

12. Early morning traffic was slow and all operations in and around the tower were routine. (NTSB Factual Report, P.E. No. 27, at p. 86)

13. At approximately 7:54:20 a.m., N48864, a Cessna 152 aircraft made initial contact with the Opa Locka ground controller. (NTSB Factual Report, P.E. No. 27, at p. 81) This was an instructional flight operated by a student pilot and an instructor. The local controller was aware that the Cessna would be engaging in training exercises (trial testimony of Moten).

14. At approximately 8:09:04 a.m. on August 31, 1987, the Cessna was cleared by the Opa Locka Airport local controller for take-off on runway 9L to enter the down wind position for Runway 9R for "touch and go" practice landings. (Transcript of recorded air traffic control communications between Opa Locka Airport local controller and local air traffic. (NTSB Factual Report, P.E. No. 27, at pp. 6 and 111)

15. Visual meteorological conditions prevailed at the time and no flight plan was filed for the instructional flight. (NTSB Factual Report, P.E. No. 27, at p. 4) The weather was VFR, the visibility was good and the wind was out of the east at 8 to 10 knots. (NTSB Factual Report, P.E. No. 27, at p. 95)

16. At approximately 7:59:11 a.m. on August 31, 1987, N672AD, the helicopter contacted ground control at the Opa Locka Airport requesting taxi to "Area Alpha", the helicopter operating area adjacent to runway 9R. (NTSB Factual Report, P.E. No. 27, at p. 19) The local controller also was aware that the helicopter was to engage in practice exercises.

17. At 8:15:49 a.m., Mr. NAKAJIMA, in the Bell Helicopter requested take off clearance from the local controller for a touch and go landing at Area Alpha. The flight was cleared for this procedure by the local controller in the Opa Locka control tower. (NTSB Factual Report, P.E. No. 27, at pp. 19 and 102)

18. At 8:15:49 a.m., the Bell helicopter was issued a traffic advisory which notified the pilot that a Cessna aircraft was in a touch and go landing pattern for runway 9R. (NTSB Factual Report, P.E. No. 27, at pp. 19 and 103)

19. At 8:17:21 a.m., local controller Moten issued a traffic advisory to the Cessna. The Cessna was notified that a helicopter was operating in Area Alpha just south of runway 9R at an altitude of 500 feet and below. (NTSB Factual Report, P.E. No. 27, at p. 103)

20. At 8:18:34 a.m., the Cessna was cleared for a third touch and go landing to runway 9R. This time, however, Mr. Mo-

ten did not inform the Cessna about the Bell Helicopter which was still operating in the area. (NTSB Factual Report, P.E. No. 27, at pp. 6 and 104)

21. At 8:20:40 a.m., the Bell Helicopter requested and was cleared for a second touch and go landing in Area Alpha. However, local Controller Moten did not inform the Bell Helicopter about the Cessna which was still operating in the area. (NTSB Factual Report, P.E. No. 27, at pp. 6 and 104)

22. Subsequent to the Bell Helicopter's acknowledgement of touch and go clearance at 8:20:46 a.m., the tower radio transcript indicates a lull in radio activity. The tower engaged in no radio communications between 8:20:53 a.m. and 8:22:05 a.m. (NTSB Factual Report, P.E. No. 27, at p. 105)

23. At 8:22:05 a.m., the control tower initiated clearance to the Cessna for a fourth touch and go landing pattern. Once again, the controller did not inform the Cessna that the Bell Helicopter was still operating in the area. (NTSB Factual Report, P.E. No. 27, at pp. 6 and 105) Again there followed a complete lull in radio activity by the local controller, Mr. Moten.

24. At 8:22:09 a.m., the Cessna acknowledged clearance for touch and go landing at Runway 9 right. The pilot did not inform the controller that he was performing a short approach simulating engine failure to his student. (NTSB Factual Report, P.E. No. 27, at pp. 6, 7 and 105)

25. Subsequent to clearance from the Opa Locka tower for a further touch and go at 8:22:05 a.m., when the Cessna was abeam of the touch down area, instruction pilot Bedoya reduced the power of the aircraft to idle and told student pilot Losado to simulate a forced landing. The Cessna, with student pilot Losado at the controls, turned from a westerly heading to a northerly heading toward Runway 9 right. As it was turning from the base leg to the final approach over Red Road, the Cessna descended and overtook the Bell helicopter colliding with it from above and from the rear. (NTSB Factual Report, P.E. No. 27, at pp. 5 and 20)

26. At 8:23:54 a.m., the Cessna transmitted to the tower: "Opa Locka tower Cessna 864 in real emergency what happened?" (NTSB Factual Report, P.E. No. 27, at pp. 7 and 105) At 8:24:58 a.m., Controller Moten replied, "Cessna 864 ah you hit the helicopter that's what happened!" (NTSB Factual Report, P.E. No. 27, at pp. 7 and 105) At 8:24:03 a.m., the Cessna replied to the tower: "But you cleared me for touch and go." (NTSB Factual Report, P.E. No. 27 at p. 105) At 8:24:06 a.m., Controller Moten replied, "I suggest you make a full stop Cessna 864." (NTSB Factual Report, P.E. No. 27, at p 105)

27. The tower radio transcript indicates no communication with either the Cessna or the Bell Helicopter for at least 1 minute and 45 seconds following the Cessna's acknowledgement for a fourth touch and go at 8:22:09 a.m. The next radio communication between the tower and either of the subject aircraft was not until 8:23:54 a.m. Just prior to that time, the Cessna aircraft and Bell Helicopter collided in mid-air.

28. The primary wreckage scene was 100 yards east of Red Road and 150 yards south of 138th Street [NTSB Factual Report, at p. 160; testimony of McWhorter and Carnevale; Aerial Photograph of Opa Locka Airport, P.E. 8 and acetate overlay, D.C., Defendant's Exhibit ("D.E.") 5B; *accord* Barrett and Manion testimony; but *contra*, Kimura testimony (100 feet east of Red Road, 200 feet south of 138th)].

## CONCLUSIONS OF LAW

A. The Plaintiff Estate claims that the Defendant United States is liable for damages resulting from the negligence of the Federal Aviation Administration's local air traffic controller, Mr. Coy Moten. Plaintiff asserts that the local controller was negligent in several respects, specifically his failure to issue sufficient traffic advisories, his failure to remain vigilant of the helicopter and the Cessna so as to observe the developing conflict between the two aircraft and consequently his failure to issue a timely safety alert to avert the mid-air collision.

B. The first contested issues to be decided are whether there was any negligence on the part of the local controller and, if so, was such negligence a proximate cause of the collision and resulting death of the Plaintiff's decedent.

C. The United States has consented to be sued for the negligence of FAA air traffic control personnel. *Eastern Airlines v. Union Trust Co.,* 221 F.2d 62 (D.C.Cir.1955), *aff'd.* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796; *Universal Aviation Underwriters v. United States,* 496 F.Supp. 639 (D.C.Colo.1980). The Federal Tort Claims Act, 28 U.S.C. Section 1346(b) provides that the United States is liable in tort for injuries which are the result of "the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment ... [as] if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

■ D. The nature and extent of the duty of due care which air traffic controllers owe pilots and their passengers is a question of law. *Daily v. United States,* 792 F.2d 1081 (11th Cir.1986).

E. The applicable law governing the liability of the United States for the acts and omissions of its air traffic controllers at Opa Locka Airport is that of the State of Florida. 28 U.S.C. Section 1346(b)

F. The duty of care owed in this instance is Florida's "traditional ... standard of reasonable care, that which a reasonably careful person would use under like circumstances." *Sergermeister v. Recreation Corp. of America,* 314 So.2d 626, 627 (Fla. 4th DCA 1975), *cert. denied,* 328 So.2d 844 (Fla.1976).

G. Having undertaken the responsibility of exercising control of air traffic in the Opa Locka Airport Traffic Area:

... the United States must meet its responsibility according to the standard of care and reasonableness based upon the requirements of the Federal Aviation Administration Air Traffic Procedure Manuals which set forth the functions and responsibilities of air traffic control personnel as well as upon reasonable pilot reliance on the government for a given service which the government has assumed.

*Gill v. United States,* 429 F.2d 1072 (5th Cir.1970)

■ H. The extent of the government's duty of care does not rest within its own discretion. The government cannot circumscribe its own liability by limiting it to the letters of its own regulation, policies, manuals and directives. *Universal Aviation Underwriters v. United States,* 496 F.Supp. 639, 650 (D.C.Colo.1980), citing *Harris v. United States,* 333 F.Supp. 870 (N.D.Tex.1971)

■ I. Federal case law involving midair collisions recognized that: "Air traffic controllers are taught to develop and use a repetitive scan technique wherein they look at the aircraft they are controlling out the window, the conditions in the immediate area of the aircraft as well as in the direction of their intended flight, the landing runway in use, the britescope reproduction of the radar information and back out the window to the aircraft. This scan technique is necessary to keep abreast of all developments that are taking place and adequately, properly and safely perform the duties of an air traffic control specialist working the local control position." *Universal Aviation Underwriters v. United States,* 496 F.Supp. 639, 647 (D.C.Colo. 1980)

J. "The issuance of a safety alert is a first priority once the controller observes and recognizes a situation of unsafe aircraft proximity to ... other aircraft. Conditions, such as work load, traffic volume, the qualities/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations. While a controller cannot see immediately the development of every situation where a safety alert must be issued, the controller must remain vigilant for such situations and issue a safety alert when the situation is recognized." Air Traffic Control Manual ("ATCM") at Chapter 2 Section 2–6 note 1

K. Chapter 2 of the ATCM, which prescribes procedures for the general control of air traffic requires controllers to "give first priority to separating aircraft and issuing safety alerts as required in this handbook. Good judgment shall be used in prioritizing all other provisions of this handbook based on the requirements of the situation at hand."

L. Under Chapter 2, Section 2–2(b), controllers are required to "provide additional services to the extent possible, contingent only upon higher priority duties and other factors including limitations or radar, volume of traffic, frequency congestion and work load."

M. The primary purpose of the air traffic control system "is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic." ATCM at Chapter 2, Section 2–2(b) note

N. Applying the above legal standards to the evidence adduced at trial, the Court finds that the local air traffic controller failed to exercise reasonable care in several respects. First, it is uncontroverted that the local controller failed "to issue traffic", i.e., to inform the Cessna and the helicopter of the other's continuing presence and location in and around "Area Alpha" during the third and fourth training patterns of the Cessna. As explained by Plaintiff's expert, Robert Rudich, each pattern flown by the respective aircraft creates a different set of spatial relationships between the two aircraft. This constitutes an ever changing, or "dynamic", as opposed to "static" situation. Thus, a traffic advisory by the tower controller to the aircraft on the first and second training patterns of the Cessna could not have been relied upon to adequately inform the Cessna or the helicopter of their continued presence and position relative to one another on the third and fourth patterns of the Cessna when the dynamics had changed. As established by Mr. Rudich, especially under the circumstances which prevailed when the tower cleared the Cessna for its fourth touch and go circuit and both aircraft were on downwind legs, it was below the standard of reasonable care not to issue a traffic advisory.

The Defendant has asserted that under no circumstance can a local controller be expected to issue traffic advisories each time an aircraft performs a pattern or circuit within the airport traffic area. However, the Defendant's position was contradicted by its own witnesses. Air traffic control specialist, Christy Wills, who was the Ground Controller at Opa Locka Airport on the morning of the collision, admitted to the NTSB Air Safety Investigation that in her FAA training "she had been taught to issue traffic to aircraft operating *in each pattern* at least one time [and] she would issue additional traffic information if she believed it to be a factor." (NTSB Factual Report P.E. No. 27, at p. 88) Similarly, another air traffic control specialist who was on duty at Opa Locka Airport on the day of the collision in the Flight Data Position, Christine Brannon, admitted to the NTSB Air Safety Investigation "that during her training, she had been taught that each pilot would fly a different pattern. It would then be necessary to monitor these aircraft and to advise aircraft of each other to make sure pilots had each other in sight." Ms. Brannon also had explained to the NTSB and reconfirmed at trial that at Opa Locka Airport "it was not uncommon for pilots to lose sight of each other and that appropriate action would have to be taken, . . . that while both traffic patterns were in use 'nothing was routine', and that [as happened here] fixed wing aircraft would 'cut out' helicopters." (NTSB Factual Report, P.E. No. 27, at p. 89)

O. Based on the evidence, the Court finds that under the circumstances prevailing when he initiated clearance to the Cessna after its fourth touch and go pattern (at 8:22:05), and thereafter until the collision itself (at 8:23:53 approx.), the local air traffic controller, Coy Moten, should have monitored the Cessna and the helicopter and advised these aircraft of each other to make sure their respective pilots had each other in sight. The local controller's failure to so monitor and issue a traffic advisory during this critical one minute forty-seven second period was negligence which con-

stituted a proximate contributing cause of the ensuing mid-air collision.

P. In addition, the Court finds that the local controller was negligent in failing to remain vigilant of the Cessna and the helicopter during the time period beginning with the Cessna's initiation of its dead-stick landing procedure until the moment of the mid-air collision itself. The evidence at trial established that the attention of the local controller was not directed toward the Cessna or the helicopter after he initiated clearance to the Cessna for its fourth touch and go exercise at 8:22:05 through and including the time period involving the Cessna's dead-stick procedure until the moment of impact. Apparently, by happenstance, the local controller observed the collision itself. Nor did he engage in any radio communications with any aircraft whatsoever during that entire time period. Just what the local controller was, in fact, doing during this critical period is unknown. The local controller could not and did not offer an explanation of his activities during that time. Nor did either of the other two FAA tower personnel offer an explanation to the NTSB or to the Court. The NTSB transcript of the tower control tape, being silent during this time period, if anything, suggest lack of attention to the two subject aircraft. This interference would appear even more compelling given the odd fact that the fourth touch and go clearance was initiated by the local controller, whereas on the first and second patterns, such clearance were requested by the pilots. Also, no one seriously contends that the local controller was, in fact, vigilant, saw the Cessna closing on the helicopter, but intentionally did nothing until after the Cessna crashed into the helicopter. Clearly, the local controller's attention was elsewhere, but where?

Q. Conspicuously absent from the statements of the local controller, Coy Moten, to the NTSB Air Safety Investigator following the accident is any credible explanation for why he did not maintain vigilance of the subject Cessna and helicopter. Plaintiff's tower control expert found the controller's failure to explain what he was doing very "unusual". Rudich added, "I would expect the controller to have ex-plained that time period." (Excerpt of trial transcript, p. 33) Particularly noteworthy, however, is the only explanation offered by Mr. Moten for not remaining attentive to these two training aircraft under his control. When confronted by the NTSB Air Safety Investigator, Mr. Moten claimed that after he cleared the Cessna for its fourth touch and go, he "was then distracted when two Coast Guard helicopters called for departure on runway 9 Center." (NTSB Factual Report, P.E. No. 27, at p. 86) Again and again at trial, Mr. Moten contended that the reason he was justified in not remaining vigilant of the two training flights in and around Area Alpha during the critical one minute and forty-seven second period between clearance and collision was because of his claim that his attention was distracted from them by the need to clear two Coast Guard helicopters for departure from a different runway. The documentary record, as well as the trial testimony of one of the Coast Guard pilots and of John McWhorter, an expert aviation accident reconstructionist, shows conclusively that both Coast Guard helicopters were cleared by Mr. Moten for departure from Runway 9 Center well before he cleared the Cessna training flight for its fourth pattern. Indeed, the tower control tape transcript verified that the last of these takeoff clearances occurred at 8:20:23. (NTSB Factual Report, P.E. No. 27, at p. 104) Thus, the fact that the last Coast Guard clearance occurred a full three and one-half minutes prior to the collision (at 8:23:53 approx.) makes impossible Mr. Moten's only excuse and explanation as to why he was distracted and did not remain vigilant.

R. Mr. Rudich testified that under all the circumstances prevailing during the critical time period Mr. Moten, in the exercise of reasonable care, should have utilized the required repetitive scan technique to pay attention to the area where the Cessna and helicopter were operating at intervals more frequent than every fifteen seconds. Mr. Rudich explained that "this is where his action was." Furthermore, all witnesses testified and the NTSB report confirms that early morning operations at

Opa Locka were routine and traffic was light. In fact, at the time of the collision, the only possible collision hazard that could have been foreseen was where the Cessna and the helicopter were operating. At least one of the Coast Guard helicopters had cleared the airport traffic area five miles to the West; the other was following approximately two miles behind and of no actual or potential threat, especially considering the vastly greater flight experience of the Coast Guard pilots as compared with the student trainees operating the Cessna and the Bell helicopter. Moreover, there were no intruder aircraft with which the local controller need be concerned. The *only* two aircraft within the airport traffic area which were operating in the same general vicinity which foreseeably could have created a collision risk were the Cessna and the helicopter. Mr. Rudich summarized the prevailing circumstances and the controller's duty to prioritize his activities by explaining that there was *nothing* which the local controller would have been justified in paying greater attention to than the area "where his action was", namely where the Cessna and the helicopter were under his control for known training flights. (Excerpt of trial transcript at pp. 32–33) That simulated dead stick approaches by fixed wing Cessnas causing the fixed-wing aircraft to cut-off helicopters operating in Area Alpha was not by any means a rare occurrence at Opa Locka Airport made the controller's duties to remain vigilant and prioritize his activities all the more critical. Such occurrences were known to and foreseeable to Opa Locka tower personnel. (NTSB Factual Report, P.E. No. 27, at p. 88, and trial testimony of Christy Wills).

S. Mr. Rudich testified that had the local controller remained vigilant, he would have had adequate time to observe the deviation by the Cessna from its altitude and horizontal pattern and issue a safety alert by radio to avert the collision. Rudich estimated it took "at least" fifteen to twenty seconds for the Cessna to initiate the observable maneuver from its pattern until it collided into the helicopter, possibly more. Rudich concluded that such a period was "not too short" a time for Mr. Moten

to perform his responsibilities safely and prudently to prevent the collision. (Excerpt of trial testimony at P. 27)

T. The Defendant contended through the testimony of Mr. Michael Carnevale that Mr. Rudich counted the minimal fifteen to twenty second period to include the moment when the helicopter impacted with the ground and further asserted his opinion that, at most, an interval of only five to ten seconds existed during which the controller could have observed and reacted. However, the Court finds that Mr. Carnevale's "time line" calculations are invalid and irrelevant to the issue of Mr. Moten's negligence. As Mr. Rudich explained, the relevant time period is that "prior to the collision", not prior to the impact of the helicopter wreckage with the ground. (Excerpt of trial testimony, at p. 27)

U. In a very similar case, it has been held that a control tower operator can be negligent in failing to see an aircraft which might constitute a hazard or result in a midair collision, even where such controller does not see the aircraft for a period of eighteen to twenty-four seconds prior to collision and, thus, makes no effort to inform the traffic of their proximities and issue appropriate warnings. A finding of negligence was based, in part, on a controller's failure to maintain a continuous watch over all aircraft within the control zone and his consequent failure to notice a private Cessna execute a 90 degree turn, even when it had clearance for touch and go landings. *United States v. Miller*, 303 F.2d 703, 705–06, n. 6 (9th Cir.1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). (Despite the controller's negligence, in *Miller*, the plaintiff pilot was denied recovery, but only because such pilot was negligent, and in Washington State at the time of the said collision, the rule of *contributory* negligence applied, totally barring recovery. Florida, of course, is a *comparative* law jurisdiction.)

V. Applying the legal standards of care, as set forth above, to the facts of this case, the Court finds that United States, through its local air traffic controller, Coy Moten, was negligent in failing to issue traffic

advisories to the Cessna and the helicopter on the Cessna's fourth pattern prior to collision. Mr. Moten was also negligent in failing to properly scan and observe the only portion of the airport traffic area in which potentially conflicting traffic existed at that time. Controller Moten's negligent failure to remain vigilant to utilizing proper scan technique proximately caused Mr. Moten's failure to issue safety alerts to the Cessna 152 aircraft and Bell 47 Helicopter which allowed the two airborne vehicles to converge in unsafe proximity to each other and ultimately to collide. (ATCM at Chapter 2); (testimony of Robert Rudich); (testimony of John McWhorter) *Universal Aviation Underwriters v. United States*, 496 F.Supp. 639, 648 (D.C.Colo.1980).

## COMPARATIVE NEGLIGENCE

W. The Defendant has raised the affirmative defense of comparative negligence. The Defendant introduced evidence to prove that KEIJI NAKAJIMA could have avoided the collision by exercising a duty to "see and avoid".

■ X. The Supreme Court of Florida has adopted a "pure" comparative negligence rule. *Hoffman v. Jones*, 280 So.2d 431, 438 (Fla.1973). Under this comparative negligence rule, if both the plaintiff and defendant are at fault, the plaintiff can still recover, but his recovery is limited to the proportion of the damages sustained by the plaintiff that were proximately caused by the defendant's negligence. *See Ganley v. U.S.*, 878 F.2d 1351 (11th Cir.1989).

■ Y. The direct and primary responsibility for the operation of aircraft over and in the vicinity of an airport rests upon the pilots of the aircraft. *American Airlines, Inc. v. United States*, 418 F.2d 180 (5th Cir.1969). Pilots operating in visual flight weather conditions have a responsibility to avoid mid-air collisions. Under such conditions, pilots are obligated to "see and avoid" other traffic, even if they are flying with a traffic clearance. *Coatney v. Berkshire*, 500 F.2d 290 (8th Cir.1974).

■ Z. A pilot's statutory duty to see and avoid other aircraft is not excused because he may have to maneuver his own aircraft in order to see the area in which another aircraft might be located. *United States v. Miller*, 303 F.2d 703, 709 (9th Cir.1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). The blindspots, or cockpit structural obstructions, found in all aircraft likewise do not excuse a pilot from his duty to see and avoid other aircraft. Before a pilot turns, climbs, descends, or otherwise travels into an area obscured by a blind spot, he should clear that area by banking, turning or otherwise changing the altitude of the aircraft. *Id.*

■ AA. KEIJA NAKAJIMA's failure to compensate for any cockpit obstructions and failure to "see and avoid" the Cessna were contributing causes of the subject collision. Based on the evidence and testimony presented at trial, this Court finds that, as between KEIJA NAKAJIMA and the UNITED STATES, KEIJA NAKAJIMA was 30% at fault and the UNITED STATES was 70% at fault for the mid-air collision.

## DAMAGES

BB. Under the Federal Tort Claims Act, 28 U.S.C. Section 1346, et seq., the proper measure of damages is determined by the law of the state in which the action accrued. The law of the state of Florida applies in this action.

■ CC. The proper measure of damages in this case is found at Florida Statute Section 768.21(6)(a), which allows for recovery by an estate of the lost "net accumulations", in addition to funeral expenses incurred as a result of a decedent's death. "Net accumulations", as defined by Florida law, means that part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings and left as his estate if he had lived his normal life expectancy. Florida Statute Section 768.18(5).

DD. At the time of his death, KEIJI NAKAJIMA was a twenty-seven year old Japanese national temporarily residing in the United States for the purpose of obtaining his helicopter pilot's license. The Court is persuaded by the evidence presented by

**1582**

the Plaintiff that KEIJI NAKAJIMA would have obtained a job in Japan as a commercial helicopter pilot upon obtaining his license. The Plaintiff introduced the live testimony of Ryoji Kozasa, a job placement specialist with ARI, the Japanese company with which KEIJI NAKAJIMA was taking his training. ARI would have managed KEIJI NAKAJIMA's job placement. Mr. Kozasa testified that there is a shortage of helicopter pilots in Japan and that KEIJI NAKAJIMA would have easily found employment as a commercial helicopter pilot.

EE. Mr. Kozasa also testified as to the ranges of income which KEIJI NAKAJIMA likely would have obtained throughout his career as a pilot. In addition, the Plaintiff entered into evidence statistical data relating to income and growth in the Japanese commercial helicopter field.

FF. The Court has considered the testimony and evidence presented at trial and finds that the probable loss of net accumulations of the estate of KEIJI NAKAJIMA, calculated pursuant to Florida Statute Section 768.18(5), and reduced to present value, is $590,000.00. This amount represents the damages in Japanese yen calculated in U.S. dollars at exchange rates prevailing at the time of trial. The Court ruled prior to trial and reiterates now that net accumulations damages sought in this case are not punitive in nature. The Federal Tort Claims Act, therefore, does not preclude recovery of such damages in this case under Florida law. See, e.g.: *Brown v. United States*, 99 F.Supp. 685 (S.D.W.Va.1951).

GG. In addition to "net accumulations", Plaintiffs are entitled to funeral expenses pursuant to Florida's wrongful death statute. Funeral expenses are recoverable by the personal representative of the estate, even when those expenses have been paid by a third party. Florida Statute Section 768.21(6)(b); *Sinclair Refining Co. v. Butler*, 190 So.2d 313 (Fla.1965). The Court concludes that Plaintiffs are entitled to recover $47,407.00 in funeral expenses.

HH. Therefore, after taking into account the 30% comparative negligence attributable to KEIJA NAKAJIMA, this Court finds that the Plaintiffs are entitled to recover $446,184.90 [1]. Judgment shall be entered in favor of Plaintiffs for $446,184.90.

II. Taxable costs are awarded to Plaintiffs as the prevailing party. Said costs are to be taxed by the Clerk of Court upon bill of costs being filed by Plaintiffs.

DONE and ORDERED.

1. 
| Net accumulations | $590,000.00 |
|---|---|
| Funeral expenses | 47,407.00 |

| Total award | $637,407.00 |
|---|---|
| Less 30% | (191,222.10) |
| Judgment amount | $446,184.90 |