George L. HENSLEY, Personal Representative of the Estate of C. Lamar Carlton and Joan G. Carlton, Plaintiff,

v.

UNITED STATES of America, Defendant.

William H. JERNIGAN, as Personal Representative of the Estate of Ernest E. Gillilan and Betty J. Gillilan, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 85–797–CIV, 85–798–CIV.

United States District Court, S.D. Florida.

Sept. 6, 1989.

As Amended Oct. 31, 1989.

Thomas K. Pfister, U.S. Dept. of Justice, Civil Div., Torts Branch, Aviation Litigation Unit, R. Brooke Lewis and David M. Wiegand, F.A.A., Litigation Div., Washington D.C., and Dexter W. Lehtinen and Robyn Hermann, U.S. Atty., S.D. Florida, Miami, Fla., for U.S.

George Farrell, Healey, Farrell & Lear, Washington, D.C., and Robert L. Parks, Anderson, Moss, Parks & Russo, P.A., Miami, Fla., for plaintiffs.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GONZALEZ, District Judge.

#### I. FINDINGS OF FACT

1. This litigation arises out of the crash of a Piper PA–24–180 aircraft, Registration No. N7554P ("54P"), on August 12, 1983. On the day of the accident, the pilot Lamar Carlton, Ernest Gillilan, and their spouses, were flying on a trip from Sebring, Florida, to Boston, Massachusetts. On the segment of the trip from Norfolk, Virginia, to Plymouth, Massachusetts, the aircraft experienced inflight structural failure and crashed shortly after the pilot reported encountering moderate rain and heavy turbulence. The aircraft wreckage was found near Pomona, New Jersey. There were no survivors.

2. The personal representatives of the Carlton and Gillilan estates brought these consolidated cases against the United States of America under the Federal Tort Claims Act, 28 U.S. §§ 1346(b) and 2671 *et seq.*, seeking damages for wrongful death.

3. Plaintiffs allege, in substance, that Federal Aviation Administration (FAA) Air Traffic Controllers ("controllers") at the New York Air Route Traffic Control Center ("New York Center") were negligent in their handling of 54P. Specifically, Plain-

tiffs allege that the controllers negligently permitted 54P to be flown into a thunderstorm or negligently vectored 54P into a thunderstorm; failed to warn Lamar Carlton of the weather conditions; and failed to advise Mr. Carlton of proper procedures to avoid encountering severe turbulence. Plaintiffs further claim that the National Weather Service (NWS) Center Weather Service Unit (CWSU) meteorologist within the New York Center negligently performed or failed to perform his CWSU Meteorologist/Weather Coordinator duties. The thrust of Plaintiffs' allegations are that the CWSU meteorologist failed to familiarize himself with the weather during his shift and failed to solicit and reply PIREPS [1] to the air traffic controllers handling 54P.

4. This matter was tried before the Court from May 29 to June 5, 1989. At trial, Plaintiffs failed to establish any negligence on the part of the controllers or the CWSU meteorologist, or that the actions or inactions of any employees of the United States of America proximately caused or contributed to the cause of this unfortunate accident.

5. Lamar Carlton, the pilot of 54P, possessed a flight instructor rating and was also rated for flight in IFR conditions.[2] He had logged approximately 2,500 hours as a pilot. Approximately 200 of those 2,500 hours were in actual instrument flight conditions. Ernest Gillilan was also a pilot.

6. Prior to departure from Norfolk, Lamar Carlton received a weather briefing from the Federal Aviation Administration (FAA) Flight Service Specialist at the Newport News, Virginia Flight Service Station. During the course of this briefing, the briefer informed Lamar Carlton of flight precautions for forecast occasional moderate turbulence below 8,000 feet, rain show-

ers, and thunderstorms along his route of flight.

7. At about 3:00 p.m. eastern daylight time (EDT),[3] 54P departed Norfolk, Virginia, destined for Plymouth, Massachusetts. The duration of the flight was to have been about three hours. At about 3:45 p.m., control of 54P was transferred from the Washington Air Route Traffic Control Center to New York Center. While under the control of New York Center, 54P was assigned to maintain an altitude of 7000 feet above mean sea level (MSL).

8. At approximately 4:26 p.m., Lamar Carlton contacted the sector R–18 controller at New York Center,[4] whereupon the following series of radio transmissions took place:

4:26:51 54P If it works, I'd like Atlantic City and then Victor Two Twenty Nine JFK. You showing any weather our present position direct, ah, Atlantic City?

4:27:01 R18 I'm not showing any weather, ah, all the way up to States Intersection.[5]

4:27:06 54P Okay, what's the name (unintelligible) States Intersection?

4:27:08 R18 Yeah, I'm not showing any weather [pause] States Intersection is, ah, off to your, be off to your right, but I'm not showing weather from your present position that far North.

4:27:16 54P Okay, we're in this moderate showers this time now.

4:27:20 R18 Okay, ah.

Later, at 4:29:32 p.m., the R–18 controller contacted 54P and the following communications took place:

4:29:32 R18 Five Four Papa, Atlantic City altimeter is two nine seven two, altitude readout indicates six thousand six hundred.

4:29:40 54P Okay, (unintelligible) descending air. We're coming back

---

1. PIREPS are "pilot reports" of weather conditions given to air traffic controllers by pilots.

2. With an IRF rating, Mr. Carlton was permitted to fly in the clouds. When actually flying in these conditions, Mr. Carlton would navigate solely by his flight instruments.

3. All times referred to herein are Eastern Daylight Time.

4. The geographical jurisdiction of each Air Route Traffic Control Center is subdivided into smaller divisions called sectors. As an aircraft proceeds enroute, it is handed off from sector to sector as it approaches each new sector boundary.

5. States Intersection was a navigational fix ahead of 54P along its route of flight.

now, and two nine seven, thank you.[6]

4:29:46 R18 Five Four Papa contact the New York Center now, one three three point two.[7]

4:29:50 54P Okay, one thirty three two.

4:30:10 54P New York Center, Comanche Seven Five Five Four Papa. We're at six thousand six hundred, trying to get back to seven thousand.

4:30:17 R39 Seven Five Five Four Papa, roger. Altimeter setting is two nine seven four.

4:30:22 54P Okay, we're in some pretty heavy turbulence at this time.

4:30:27 R39 I missed that, say again.

4:30:34 R39 Five Four Papa, I missed your comment.

4:30:40 54P We're in some heavy turbulence now.

4:30:42 R39 Okay.

Shortly afterwards radio and radar contact with the aircraft were lost. The Wreckage was found approximately five miles Northeast of the Atlantic City International Airport. There were no survivors.

9. The National Weather Service (NWS) operates a network of weather radars that are specifically designed to depict precipitation.[8] The NWS radars at New York City, New York, Atlantic City, New Jersey, and Patuxent River, Maryland, showed that the maximum rainfall rate in the accident area at or near the time of the accident was of a VIP level two intensity.[9] This is equivalent to a rainfall rate of .2 to 1.1 inches per hour. Mr. Carlton characterized the rain he encountered just prior to the accident as "moderate." Paragraph 515 of the Airman's Information Manual, a handbook of aeronautical knowledge with which pilots are required to be familiar, defines "moderate rain" as a rainfall rate of .11 to .30 inches per hour. This is consistent with a VIP level one (or possibly two).

10. At the time of the accident, New York Center was using a computer-generated digitized radar display, known as narrowband radar. The only weather phenomenon capable of appearing on the controllers' radar scopes was precipitation. Turbulence, lightning, thunder and "thunderstorms" cannot be depicted on the radar scopes. Furthermore, not all precipitation is capable of being displayed on the scope. Narrowband radar is designed to enhance the presentation of the "targets" or symbols depicting aircraft flying through the applicable airspace. To ensure that weather precipitation returns or depicitions do not obliterate aircraft targets, thereby making separation of aircraft difficult or impossible, narrowband radar, by design, suppresses weather information so that the symbols representing the aircraft can be seen clearly.[10]

11. At 4:26:51, when 54P asked the R–18 controller what weather information was being shown on his radar scope, the controller told 54P that no precipitation was being displayed on his scope in the aircraft's vicinity. Plaintiffs' air traffic control expert, Mr. John Amatetti, testified that he had no reason to doubt that the R–18 controller was telling the truth when making this statement.

12. Moreover, Plaintiffs failed to introduce any evidence that there was any precipitation displayed on any controller's scope during the period of time 54P was being handled by New York Center.

---

**6.** The testimony of Plaintiffs' air traffic control expert, Mr. Amatetti, conflicted with the contents of the transcript contained in the Federal Aviation Administration Air Traffic Accident Package admitted into evidence as Plaintiffs' exhibit 63. While the tapes were not played or admitted into evidence, the Court finds that the conflicts in the evidence regarding this particular transmission are not material to the determination of this action.

**7.** At this time, radio communications were transferred from the R–18 to R–39 sector controller.

**8.** FAA radars, on the other hand, are specifically designed to depict aircraft targets. As discussed *infra*, these radars by necessity are designed to suppress certain precipitation returns.

**9.** VIP is a unit of measurement used by the NWS to define rainfall rates.

**10.** Air Traffic Control radar is limited in its ability to depict precipitation by such features as the decibel level return thresholds, Moving Target Indicator (MTI), and Sensitivity Time Curve (STC).

13. Pilots are taught through the Airman's Information Manual (AIM) about the limited ability of air traffic control radar to display weather data. Pilots are also taught that air traffic control radar does not depict turbulence.

14. Approximately fifteen minutes before 54P contacted the R–18 controller, another aircraft, registration number N756PU ("56PU"), contacted the R–39 control position and the following transmissions occurred:

4:12:32 R39 Papa Uniform, did you call?

4:12:34 54P That's affirmative sir. Looks like you got a little buildup here. I was wondering if I could deviate on a heading of about zero nine zero for a few miles?

4:12:41 R39 Papa Uniform, deviation to the right is approved.

4:12:44 54P Papa Uniform, thank you.

15. 56PU's report of a "little buildup" was not a significant or pertinent PIREP required to be passed along to other pilots under the terms of the Air Traffic Control Manual 7110.65C ("7110.65C").[11] This report merely conveyed the existence of a cloud, the dimensions and location of which were not known.

16. The evidence did establish, however, that the pilot of 56PU visually observed the "little buildup" ahead of him and asked for permission to deviate. 54P was flying on the same route, at the same altitude, and approximately 15 minutes behind 56PU. Unlike the pilot of 56PU, pilot Carlton did not request to deviate.

It is of particular significance that no other aircraft in the area except 56PU reported any exceptional, unusual or potentially dangerous weather conditions, nor did any pilot in the area pass along a PIREP. Except for 56PU's request to deviate there was *nothing* to indicate or even suggest *any* unusual or remarkable weather conditions in or near the area of the accident.

17. 54P crashed after experiencing inflight structural failure. During the course of the failure, the horizontal tail structure went into a flutter condition and separated from the aircraft's fuselage. The outboard portions of the wings failed in a downward fashion.

18. Plaintiffs' accident reconstruction expert, Mr. Daniel Sayers, testified that 54P encountered a severe wind gust that deformed the leading edges of 54P's wings in a downward fashion and induced structural failure. However, in his report, which was admitted into evidence, Mr. Sayers opined that wind gusts of an intensity severe enough to deform the wings in this fashion would be of type associated with severe thunderstorms.[12]

19. The FAA air traffic controllers at New York Center, at all times relevant to this action, complied with the Air Traffic Control Manual and acted as reasonably prudent air traffic controllers under the circumstances, fulfilling all responsibilities imposed by law upon them.

20. Plaintiffs' allegations of negligence on the part of the CWSU meteorologist were wholly unsupported by the evidence.

21. The Court also finds that Plaintiffs' contentions that the CWSU Meteorologist/Weather Coordinator failed to familiarize himself with the weather conditions and failed to relay required PIREPS are unfounded. More specifically, the evidence

11. Paragraph 49. of 7110.65(C) provides in part: Significant PIREP information includes reports of strong frontal activity, squall lines, thunderstorm, moderate to severe icing, wind shear and turbulence (including clear air turbulence) of moderate or greater intensity, or other conditions pertinent to flight safety.

\* \* \* \* \* \*

d. Handle PIREPs as follows:
(1) Relay pertinent PIREP
(2) EN ROUTE: Relay all operationally significant PIREPs to the facility weather coordinator. Federal Aviation Administration, Air Traffic Control Handbook, 7110.65C, par. 49.

12. In Mr. Sayers' report concerning the accident, entitled "Factual Report of Structural Investigation" and admitted into evidence as Plaintiffs' Exhibit 13, he states that "It is my professional opinion that the aircraft's structure was overstressed to the point that the design limits were exceeded and in-flight separation occurred. The overstress resulted from encountering high vertical wind gusts associated with severe thunderstorm activity."

showed that the meteorologist obtained a pre-duty briefing from the meteorologist he relieved earlier that day. Furthermore, Plaintiffs failed to establish the existence of any significant pilot reports that the CWSU Meteorologist/Weather Coordinator would have been under an obligation to pass on to pilots.

22. Plaintiffs failed to establish any negligence on the part of the United States and/or the personnel at New York Center in connection to the crash of 54P.

23. The actions or inactions of personnel at New York Center were not the proximate cause of the crash of 54P.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Choice of Law

1. The Court has jurisdiction over this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.*

2. Venue in this district is proper. 28 U.S.C. § 1402(b).

3. Under the FTCA, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his employment under circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Under the FTCA, the "whole law", including the choice of law rules, of the state where the alleged act or omission occurred governs the rights and liabilities of the parties. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961).

4. This accident arises out of the alleged negligent acts of employees at the New York Center in Islip, New York. The "whole law" of New York, including its choice of law rules, thus applies to this action. In determining choice of law questions in tort actions, New York courts apply an "interest analysis" test. *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 480 N.E. 679, 684, 491 N.Y.S.2d 90, 95 (N.Y.1985). Under this approach, "the law of the jurisdiction having the greatest interest in the litigation will be applied...." *Id.* (quoting *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 237 N.E.2d 877, 290 N.Y.S.2d 734 (1968)). Under New Yorks' "interest analysis" test, the significant contacts looked to in determining which jurisdiction has the greatest interest are primarily the parties' domiciles and the locus of the tort. *Id.* Applying New York's choice of law rules to the instant action, the state of Florida has the greatest interest in this litigation. This Court will therefore apply the substantive law of the state of Florida in determining the rights and liabilities of the parties.

### B. Actionable Negligence in Florida

5. Under Florida law, the elements of actionable negligence are: 1) a legal duty owed by defendant to plaintiff; 2) breach of the duty by defendant; and, 3) injury sustained as a proximate result of the breach. *Stahl v. Metro. Dade County*, 438 So.2d 14, 17 (Fla. 3d DCA 1983); *Walker v. Walker*, 430 So.2d 505, 600 (Fla. 3d DCA 1983); *Reinhart v. Seaboard Coast Line R.R. Co.*, 422 So.2d 41, 43 (Fla. 2d DCA 1982); *Clark v. Boeing Co.*, 395 So.2d 1226, 1228 (Fla. 3d DCA 1981).

6. The ordinary rules of negligence and due care apply in determining liability in actions arising from the operation of an aircraft. *American Airlines, Inc. v. United States*, 418 F.2d 180, 191 (5th Cir.1969); *United States v. Schultetus*, 277 F.2d 322, 325 (5th Cir.1960); *see Black v. United States*, 441 F.2d 741, 743–44 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). The standard of care applicable to negligence actions under Florida law is one of reasonable care; that which a reasonably careful, prudent, and cautious person would use under the circumstances. *Russ v. State*, 191 So. 296, 298 (Fla.1939); *Bradley v. Guy*, 438 So.2d 854, 855 (Fla. 5th DCA 1983); *Miriam Mascheck, Inc. v. Mausner*, 264 So.2d 859, 861 (Fla.3d DCA 1972).

■ 7. To establish proximate cause under Florida law, plaintiffs must show that the defendant's alleged wrong caused the damage complained of. *Tampa Elec. Co. v. Jones*, 138 Fla. 746, 190 So. 26, 27 (1939); *Borenstein v. Raskin*, 401 So.2d 884, 886 (Fla. 3d DCA 1981); *Fellows v. Citizens Fed. Sav.*, 383 So.2d 1140, 1141 (Fla. 4th DCA 1980); *Rosen v. Parkway Gen. Hosp., Inc.*, 265 So.2d 93, 94 (Fla. 3d DCA 1972). "There must be such a natural, direct and continuous sequence between the negligent act and the injury that it can reasonably be said that but for the act the injury would not have occurred." *Sardell v. Malanio*, 202 So.2d 746, 747 (Fla.1967) (emphasis deleted); *Fellows*, 383 So.2d at 1141; *Borenstein*, 401 So.2d at 886; *see also Tampa Elec. Co.*, 190 So. at 27 (ordinary natural sequence from the negligence, or such as naturally and ordinarily should have been regarded as a probable result). Thus, the "but for" test or causation in fact is an essential element to proximate cause. *See Sardell*, 202 So.2d 746.

### C. Burden of Proof

■ 8. The burden of proving negligence is on the party that asserts it. *Hart v. Blankemore*, 410 F.2d 218 (5th Cir.1969). Plaintiffs must prove negligence by a preponderance of the evidence. *Slade, Inc. v. Scurlock Oil Co.*, 418 F.2d 847, 849 (5th Cir.1969); *Brown v. Seaboard Coastline R.R.*, 405 F.2d 601, 603 (5th Cir.1968); *Falls Church Airpark, Co. v. Mooney Aircraft*, 254 F.2d 920, 924 (5th Cir.1958).

### D. Duties and Responsibilities of Air Traffic Controllers

■ 9. The primary function of the Air Traffic Control System is to provide the service of separating IFR and participating VFR aircraft from each other. The basic duties and responsibilities of controllers are encompassed in the Air Traffic Control Manual, FAA Order 7110.65C. The air traffic controller's duty of due care is concurrent with the duty of the pilot. *Miller v. United States*, 587 F.2d 991, 995 (9th Cir.1978); *Spaulding v. U.S.*, 455 F.2d 222 at 226 (9th Cir.1972).

■ 10. An air traffic controller may rely on the assumption that a pilot knows and will abide by all applicable Federal Aviation Regulations (FARs). *In re Air Disaster at New Orleans (Moisant Field, Louisiana on March 20, 1969*, 422 F.Supp. 1166 (W.D.Tenn.)), *aff'd*, 544 F.2d 270 (6th Cir.1976); *Crossman v. United States*, 378 F.Supp. 1312, 1318 (D.Ore. 1974). This includes information contained in the Airman's Information Manual and FAA Advisory Circulars. *Mallen v. United States*, 506 F.Supp. 728, 735 (N.D.Ga. 1979); *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 680 (N.D.Tex.1978); *see Thinguldstad v. United States*, 343 F.Supp. 551, 557 (S.D. Ohio 1972) (information in Advisory Circulars). A pilot has a duty to be aware of danger when he can perceive it with his own eyes. *Redhead v. United States*, 686 F.2d 178 (3rd Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); *Black*, 441 F.2d 743–44; *Spaulding*, 455 F.2d at 227; *Associated Aviation Underwriters*, 462 F.Supp. at 681; *Thinguldstad*, 343 F.Supp. at 558. The pilot "must look out for and avoid dangerous weather conditions." *Mallen*, 506 F.Supp. at 735; *Associated Aviation Underwriters*, 462 F.Supp. at 681; *see Black*, 441 F.2d at 744.

11. The Air Traffic Control Manual does not require Air Traffic Controllers to provide weather information to pilots. *See Barbosa v. United States*, 811 F.2d 1444 (11th Cir.1987). Addressing this rule of law, the United Court of Appeals for the Eleventh Circuit, in *Barbosa*, reasoned as follows:

> Plaintiffs argue that the [Air Traffic Control Manual] *requires* controllers to provide weather information to pilots. However, we do not read the ATCM as setting forth such mandatory duties with regard to weather information. Weather information is available to pilots, both on the ground and airborne, from other sources. Radar-observed weather information falls under the "additional services" provisions of the ATCM 7110.656, § 3, par. 50. Additional services are to

be provided by controllers only "to the extent possible," contingent upon such factors as limitations of radar and higher priority duties. ATCM 7110.6513, § 3, par. 45; *Mallen*, 506 F.Supp. at 735.

■ 12. In some circumstances, an air traffic controller may be required to provide information not required by the Air Traffic Control Handbook, but only if extreme danger is reasonably apparent to the controller and not apparent, in the exercise of due care, to the pilot, such that the air traffic controller is in a superior position to perceive that the pilot is in immediate danger. *Miller v. United States*, 587 F.2d 991, 995 (9th Cir.1978); *American Airlines*, 418 F.2d at 193; *Baker v. U.S.*, 417 F.Supp. 471 at 486 (D.C.Wash.1975); *Spaulding*, 455 F.2d at 226 n. 8.

■ 13. Plaintiffs failed to establish that any weather information was or should have been depicted on the radar scopes of the controllers handling 54P that should have been relayed to the aircraft. The controller manning the R–18 position at the time Lamar Carlton inquired about the weather informed 54P that he was not depicting any weather in the aircraft's vicinity. The controllers were not negligent in their handling of 54P on the day in question.

14. The controllers handling 54P had no reason to believe that the Lamar Carlton needed any special assistance. Carlton did not request any special assistance.

15. Furthermore, the controllers handling 54P did not have a duty to inform Lamar Carlton of N756PU's request for a deviation and, thus, the fact that the controllers did not inform 54P of the deviation request cannot be found to have been imprudent.

16. While it is not necessary to the determination of this action to reach the issue of proximate cause, nevertheless, assuming *arguendo* that Plaintiffs had established negligence on the part of the United States, they failed to establish that any such negligence was the proximate cause of this unfortunate accident.

17. Nothing that employees of the United States of America did or failed to do caused or contributed to the crash of 54P and the deaths of the four people on board.

18. Upon the facts and the law, the Plaintiffs in this case have shown no right to relief and accordingly it is

ORDERED AND ADJUDGED that:

1) Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, this cause is hereby involuntarily DISMISSED.

2) Final Judgment will enter on behalf of the Defendant, United States of America, and against the Plaintiffs.

3) Defendant will submit an appropriate form of Final Judgment for entry in this case.

DONE AND ORDERED.