Thomas SCRUGGS and Deborah Scruggs, his wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 94–14274–CIV–MOORE.

United States District Court,
S.D. Florida.
Ft. Pierce Division.

March 20, 1997.

Robert L. Parks, Haggard Parks & Stone PA, Coral Gables, FL, for Plaintiffs.

Thomas K. Pfister, Barry F. Benson, U.S. Department of Justice, Civil Division Torts Branch, Aviation/Admiralty Staff, Washington, DC; Major Eugene J. Kirschbaum, Department of the Air Force, Air Force Legal Services Agency, Arlington, VA, for the United States of America.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

K. MICHAEL MOORE, District Judge.

PLAINTIFFS Thomas Scruggs ("Thomas Scruggs") and Deborah Scruggs ("Deborah Scruggs"), bring this action against Defendant United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

THIS MATTER was tried before the Court without a jury from December 5–12, 1996. Upon consideration of the entire record herein, including but not limited to the evidence adduced at trial, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters the following findings of fact and conclusions of law.[1]

### *FINDINGS OF FACT*

**A. Background**

1. This action arises out of a near-miss incident which occurred on July 7, 1992 between Thomas Scruggs' Maule model MX–7–180 civilian aircraft ("Maule") and a United States Air Force ("USAF") F–16A aircraft.

2. On the day of the incident, the USAF was conducting a training mission identified

---

1. These Findings of Fact and Conclusions of Law are to be considered severally. Any finding of fact made which constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law made which constitutes a finding of fact is hereby adopted as a finding of fact.

as Mako 01 (the "Mako Flight") from Homestead Air Force Base ("AFB") to Avon Park Gunnery Range, Florida ("Avon Park").

3. Avon Park is located approximately sixty miles east of McDill Air Force Base and forty miles south of Orlando, Florida. Avon Park is located in restricted airspace identified as "R–2901."

4. The incident occurred in special use airspace designated as a Military Training Route ("MTR"), near the southern border of restricted area R–2901 and north of Lake Okeechobee.

5. The Mako Flight was flying under Instrument Flight Rules ("IFR") to transit airspace identified as "IR–34," a low-level MTR.

6. IR–34 begins off the west coast of Florida near Key West. The floor at that point is between 1,000–2,000 feet. As IR–34 approaches Lake Okeechobee, the floor is 100 feet and the ceiling is 2,000 feet. Due to noise abatement problems, however, the military pilots must actually fly at an altitude of 1,500 feet in this area. Locations along IR–34 are designated alphabetically, A through H.

7. Thomas Scruggs was flying under Visual Flight Rules ("VFR") from Tampa, Florida to Stuart, Florida.

8. A pilot flying under IFR conditions is required to operate in accordance with current IFR procedures. In essence, IFR means that the pilot relies on his or her aircraft's instruments to control his aircraft. The pilot, therefore, relies on his or her flight instruments and concomitantly maintains a visual scan for other aircraft.

9. On the other hand, a pilot flying under VFR conditions controls his or her aircraft without instruments and relies solely on his or her ability to visually see other aircraft. In addition to requiring a pilot to maintain a visual scan for other aircraft, VFR procedures require a pilot, among other things, to maintain a certain separation from clouds and a minimum visibility.

**B.   Avon Park Gunnery Range**

10. Avon Park is divided into two separate ranges: the northern range complex known as Bravo/Fox range complex and the southern range complex known as Charlie/Echo range complex.

11. There are three control tower buildings on Avon Park: one at the Bravo/Fox range complex, one at the Charlie/Echo range complex, and the third on the Avon Park main base.

12. The Bravo/Fox range complex and the Charlie/Echo range complex are staffed with range control officers ("RCOs"). The RCO is not an air traffic controller.

13. Avon Park Operations is located in the main tower. Avon Park Operations does not have radar capability and does not perform air traffic control functions.

14. Avon Park Operations' function, among other things, is to coordinate the military planes that fly onto and out of the range.[2]

15. For instance, a pilot operating a military aircraft would contact Avon Park Operations to verify that it can enter the range. If the range is available, the pilot then would contact the RCO to receive final clearance to enter the range.

**C.   The Mako Flight**

16. The Mako Flight consisted of four F–16A aircraft, identified as Mako 01, Mako 02, Mako 03, and Mako 04.

17. The purpose of the Mako Flight was to accomplish basic surface attack training. The mission elements included, among other things, chase maneuvers at low altitude. This maneuvering was done on a section of MTR IR–34 which is specifically designated as a fighter maneuvering area.

18. Major Gregg P. Steinhilpert ("Steinhilpert") led the Mako Flight. The Mako Flight consisted of Steinhilpert, Colonel Larry Twitchell, Captain John Hart, and Lieutenant Colonel Joseph Dunaway, all of whom were assigned to the 93rd Fighter Squadron, 482 Fighter Wing, USAF Reserve, based at Homestead Air Force Base, Florida.

19. As flight leader, Steinhilpert planned the training mission. The planning stage included, but was not limited to: obtaining the current and forecast weather for the

**2.**  Avon Park Operations' communication, there-
fore, generally is limited to military personnel.

route of the flight, planning and verifying the duties of each of the flight members, and obtaining Notices to Airman ("NOTAMS").

20. Steinhilpert briefed the Mako Flight pilots on the training mission. Briefing was extensive and included, but was not limited to, assigning specific duties to the Mako Flight pilots, discussing tactical moves, navigation points, and points of entry, and discussing emergency procedures.

21. The Mako Flight departed Homestead AFB at approximately 9:14 a.m. and flew under Instrument Flight Rules ("IFR") to transit airspace identified as "IR–34," a low-level MTR.

22. The Mako Flight flew in an off-center box formation, with Mako 01 and 02 leading and Mako 03 and 04 lagging behind.

23. The Mako Flight entered IR–34 at Point D from a cruising altitude of 14,000 feet.[3] From Point D to H, the Mako Flight flew at an altitude of 500 feet and then between 1,000–1,500 feet. At Point I, the area of the near-miss incident, the Mako Flight flew at an altitude of 1,500 feet.

24. At certain points on the IR route, the Mako Flight was required to check in with the Federal Aviation Agency ("FAA") air traffic control center ("Miami Center").[4] For instance, the Mako Flight contacted Miami Center at Point D. The Mako Flight also contacted Miami Center at Point F.

25. Approximately ten miles north of the northwest shore of Lake Okeechobee, Mako Flight ceased reporting to Miami Center and switched onto Avon Park. This occurred at approximately 9:36:14 a.m.

### D. Thomas Scruggs' Flight

26. On the day of the incident, Thomas Scruggs was operating his Maule aircraft under Visual Flight Rule ("VFR") conditions.

27. Thomas Scruggs departed at approximately 9 a.m. from Tampa, Florida and headed toward Stuart, Florida.

28. Prior to departure, Thomas Scruggs did not make any inquiries or obtain any information pertaining to whether there were any NOTAMS identifying high-speed military training flight activity on the designated low-level MTRs along Thomas Scruggs' anticipated route of flight. Specifically, Thomas Scruggs did not make any inquiries into whether there was any planned activity on IR–34.[5]

29. Prior to departure, Thomas Scruggs did not contact Miami Center.

30. Thomas Scruggs, however, did contact Avon Park at approximately 9:14 a.m. At that point, Avon Park informed Thomas Scruggs that the range was "hot."

31. Thomas Scruggs informed Avon Park that he was holding south of R–2901 at an altitude of 1,400 feet and then was heading east.

32. Although Thomas Scruggs provided Avon Park with scant information regarding his position, Avon Park was not aware of Thomas Scruggs' location, principally because Avon Park does not have radar capability.

33. Thomas Scruggs testified that he knew Avon Park did not have radar capability and that Avon Park was not an air traffic control center.

34. Thomas Scruggs further testified that it was his understanding that, when the range was "hot," he should avoid the MTR area entirely.

---

3. *See* Defendant's Exhibit 2 for IR–34 profile and referenced points.

4. These contact points are very important insofar as it provides information to Miami Center regarding the location of the military aircraft; Miami Center, in turn, can provide this information to requesting civilian aircraft.

5. Homestead AFB provides Notices to Airmen ("NOTAMS") to flight service stations or Miami Center, an air traffic control center. NOTAMS contain information on the special use airspace,

such as the active IR's. NOTAMS are available to civilian pilots. On the day of the incident, the NOTAMS did not indicate any activity on IR–34. However, the NOTAMS did indicate that IR–49 and IR–50 would be active from 7:50 a.m. until 2:00 p.m., local time, at altitudes of 6,000 feet and below. IR–34 corresponds with IR–49 and IR–50, and all three IR's actually become one route leading into R–2901–I. The near-miss incident occurred in an area identified as R–2901–I; at that point, IR–34, IR–49, and IR–50 all converge with respect to route and diverge solely with respect to floor and ceiling altitudes.

35. Thomas Scruggs further testified that it was his understanding that he should look at "flight following" or call a flight service station for assistance when the range was "hot."

36. Thomas Scruggs did not contact Miami Center during his flight, even after Avon Park notified him that the range was "hot."

37. Thomas Scruggs testified that he did not contact Miami Center because he knew that, if he contacted Miami Center, he would be directed to climb to 3,500 feet.

38. Thomas Scruggs testified that he did not want to climb to a higher altitude because he thought he had to remain at his altitude of 1,400 feet in order to maintain VFR conditions. Thomas Scruggs testified that he believed he would be in IFR conditions if he climbed to 3,500 feet.

39. During his flight, Thomas Scruggs maintained an altitude of 1,400 feet. Thomas Scruggs did not make any attempt to climb to a higher altitude during his flight.

40. Although Thomas Scruggs testified that cloud coverage prevented him from climbing to a higher altitude, the government's expert witness, Lee Ray Hoxit, presented credible evidence of the weather conditions around the area of the near-miss incident, including satellite imagery which to a near certainty revealed the presence or absence of cloud coverage as well as the location, time, and density where such cloud coverage was found to exist.[6]

41. Hoxit testified that visibility was between five to seven miles with low-level haze. Hoxit further testified that, in the Tampa/Lakeland area, the clouds were low around 2,000 to 2,500 feet and were scattered and occasionally broken. Hoxit also testified

that the area approaching the near-miss incident, however, was free of clouds. These conditions extended eastward to the Stuart area.

42. Hoxit based his testimony on surface weather observations and satellite imagery.[7]

43. At the time of the incident, Thomas Scruggs' pilot flight medical certificate was not active; the medical certificate had expired on January 31, 1991.

### E. The Near–Miss Incident

44. At the time of the near-miss incident, neither the F–16A military aircraft nor Thomas Scruggs' aircraft was visible by radar or were under the control of Miami Center.

45. The near-miss incident occurred at approximately 9:41 a.m. as Thomas Scruggs headed in an easterly direction and the Mako Flight, to Scruggs' right, headed in a northerly direction.

46. At approximately 9:38:54 a.m., the Mako Flight was on the south extension of R–2901 awaiting clearance from the RCO onto R–2901 A & B.

47. Steinhilpert testified that, while flying at 500 miles per hour, he visually acquired Thomas Scruggs' aircraft at approximately and, in an effort to avoid the aircraft, took evasive action. Steinhilpert performed a pull-up and leveled off at approximately 2,200–2,700 feet.

48. Richard Lansing Cutshall ("Cutshall") transcribed the recording of communications among Avon Park, the Mako Flight and Thomas Scruggs on the day of the near-miss incident.

49. The transcript of the recording from Avon Park Operators Channels 6 & 7 on the morning of July 7, 1992 is as follows:

The certified weather observers measure wind and temperature and for aviation purposes note visibility, sky conditions, and cloud coverage. Observations on cloud coverage includes, among other things, the base of the clouds, whether the clouds are scattered or broken. Satellite imagery consists of photographs taken by weather satellites launched by NASA. The photographs are taken in thirty minute intervals.

---

6. Both Steinhilpert and Dunaway, two of the Mako Flight pilots, testified that weather conditions were good. Dunaway testified that there was a haze layer at 1,500 feet, but that it was very easy to look above or below the haze layer.

7. Surface weather observations reflect the hourly observations of certified weather observers at various locations throughout the United States.

| | | |
|---|---|---|
| 0914:00 | N148DP | Good morning Avon Park this is Maule 148 Delta Papa. |
| 0914:08 | Avon Park | Aircraft calling Avon say again please. |
| 0914:11 | N148DP | Maule "M" "A" four slash alpha uniform November 148 Delta Papa was wondering if you were active this morning. |
| 0914:20 | Avon Park | Roger that sir, the entire range is hot with fast movers. |
| 0914:23 | N148DP | Roger, eight Delta Papa will hold south. |
| 0914:26 | Avon Park | Roger. |
| 0927:50 | N148PD | Avon Park this is Maule one four eight Delta Papa. |
| 0927:53 | Avon Park | Delta Papa Avon go ahead. |
| 0927:54 | N148PD | Roger, we're going to hold south of the R two nine zero eleven restricted area and then we will head east. |
| 0928:07 | Avon Park | Roger sir, we're still hot. |
| 0928:11 | N148PD | Roger, we'll be at one thousand four hundred feet, sir. |
| 0936:14 | Mako 01 | Avon Ops, Mako zero one. |
| 0936:16 | Avon Park | Mako, Avon Ops. |
| 0936:19 | Mako 01 | Mako zero one, flight of four for Charlie Echo at thirty. |
| 0936:22 | Avon Park | Roger, entire range is cold no aircraft holding altimeter three zero one, you can contact Charlie ranger your button fourteen for clearance on. |
| 0936:30 | Mako 01 | Ah roger, that's good, did you get the request for the south extension and the range complex up to twenty-three thousand feet. |
| 0936:38 | Avon Park | Okay I understand I had you down for eighteen thousand will make a request for twenty-three will get right back to you, in the mean time will pass it to ranger. |
| | | * * * |
| 0938:48 | Avon Park | Charlies up. |
| 0938:54 | Mako 01 | Mako one is with you on the south extension and we're looking for clearance on the range. |
| 0935:05 | Avon Park | Roger, be advised you've got south extension to eighteen thousand and Avon High to twenty-three thousand approved until ten o'clock, you're cleared on Echo flight lead control first pass hot, TOSS is on the SA2 and the altimeter is three zero one two. |
| | | * * * |
| 0940:10 | Mako 01 | Cameras on. |
| 0941:00 | N148DP | Avon Park this is Maule one four eight Delta Papa. |
| 0941:06 | Avon Park | Delta Papa Avon go ahead. |
| 0941:07 | N148DP | I've been hit by one of your jets I'm still in the air, but I don't know how long this things going fly. |
| 0941:17 | Avon Park | Delta Papa understand you got an emergency sir? |
| 0941:22 | N148DP | That affirmative I'm squawking seven seven zero zero at this time I'm trying to stay in the air. |
| 0941:27 | Avon Park | Okay, stand by sir, I didn't catch that request the first time, let me close the ranges, how far out are you? |
| 0941:38 | N148DP | Four miles due west of Lake Okeechobee Airport coming down highway Seventy-six, Seventy, whichever it is. |
| 0941:48 | Avon Park | Okay, I'll tell you what, you're cleared to come on in land Avon Park at your discretion, runway two three, let me get the guys to clear the range, stand by. |
| 0942:10 | N148DP | I don't if I can make it there or not, I don't even know where you are. |
| 0942:17 | Avon Park | We're all the way in Avon Park, sir, ah, could you give me a bearing on you, we don't have radar at the range. |
| 0942:26 | N148DP | Okay, sir right now I'm two miles east of Lake Okeechobee Airport. I'm going to land at Lake Okeechobee airport if I can. |
| 0942:36 | Avon Park | Okay sir, uh, I guess you're on the wrong frequency, this is Avon Park bombing range sir, I'll tell you what you ah contact Miami center on one three three point five with your request. |
| 0942:47 | N148DP | What I've got left up here, I'm just fighting this thing to keep it in the air. |
| 0942:52 | Avon Park | Understand sir, I don't know where you are and I don't have any radar, let me get someone to help you stand by. |

| | | |
|---|---|---|
| 0943:45 | Avon Park | Delta Papa Avon. |
| 0943:47 | N148DP | Roger, go ahead. |
| 0943:49 | Avon Park | Okay roger sir do you see your airport in sight. |
| 0943:52 | N148DP | That affirmative, I do have the airport in sight, but I'm going to try to get on home to my home base. I'm doing alright, but my struts are bent on one side, my door has blown open, I've got un, don't even know if I have a landing gear left or not. I want to go somewhere where I can get an emergency landing, sir. |
| 0944:15 | Avon Park | Okay sir, if you have got an airport in sight I suggest you go ahead and set the aircraft down there sir. I have no way of saying where you are, I have no radar here. |
| 0944:25 | N148DP | Roger, than you. |
| 0945:04 | Avon Park | Delta Papa Avon. |
| 0945:07 | Avon Park | Delta Papa Avon. |

## F. Thomas Scruggs' Physical Condition

50. Thomas Scruggs alleges he sustained injuries as a result of the near-miss incident.

51. Several hours after the near-miss incident on July 7, 1992, Scruggs went for a physical examination to renew his FAA medical certificate.

52. Although Scruggs dated his application July 7, 1991, he completed his application on July 7, 1992. On his application, Thomas Scruggs represented that he had never had, among others, the following conditions: frequent or severe headaches; dizziness or fainting spells; unconsciousness for any reason; neurological disorders, epilepsy, seizures, strokes, paralysis, etc.; mental disorders of any sort; and depression, anxiety, etc.

53. At the time of his examination, Thomas Scruggs did not inform the doctor about the near-miss incident.

54. The report of the medical examination indicated that Thomas Scruggs had been found to be normal for, among others, the following: head, face, neck, and scalp; skin; upper and lower extremities; spine, other musculoskeletal; identifying body marks, scars, tattoos; neurologic; psychiatric; and general systemic. Upon completing his physical, Thomas Scruggs was issued a Class III medical certificate.

55. On subsequent applications for medical certificates, Thomas Scruggs again represented, as he did on his application of July 7, 1992, that he did not have, and never had, any unusual conditions.

56. Thomas Scruggs has been treated by four physicians since the near-miss incident.

57. On July 9, 1992, Dr. Raymond J. Oenbrick ("Dr.Oenbrick") performed a general medical and neurologic examination on Thomas Scruggs. Dr. Oenbrick diagnosed Thomas Scruggs with possible cervical and lumbar disc trauma and post-traumatic stress disorder.

58. On July 23, 1992, Dr. Irvine Mason ("Dr.Mason") performed a neurological exam on Thomas Scruggs. Dr. Mason diagnosed Thomas Scruggs as having cervical disc radiculopathy, i.e., compression of the nerve root as it exited the spinal cord in the cervical spine down to one of the extremities. Dr. Mason further diagnosed Thomas Scruggs as having lumbar discs and stenosis, i.e., narrowing of the lumbar spine.

59. On February 16, 1993, George W. Sypert ("Dr.Sypert"), a neurosurgeon, examined Thomas Scruggs. Dr. Sypert diagnosed Thomas Scruggs as having preexisting cervical spondylosis and preexisting lumbar spondylosis. Thomas Scruggs had chronic degenerative disorders which existed prior to the near-miss incident.

60. On February 26, 1993, Dr. Sypert performed the first of two operations on Thomas Scruggs' neck (cervical). On April 4, 1993, Dr. Sypert performed the second surgery on Thomas Scruggs' lower back (lumbar).

61. On September 15, 1993, Thomas Scruggs began therapy with Dr. Frederick Schaerf ("Dr.Schaerf"), a neuropsychiatrist.

62. Dr. Schaerf diagnosed Thomas Scruggs as having somatoform pain disorder insofar as Thomas Scruggs complained of persistent pain and as suffering from major depression. Dr. Schaerf had the opinion that Thomas Scruggs might be suffering from

post traumatic stress symptom, although not necessarily post traumatic stress disorder.

63. Dr. Schaerf further had the opinion that Thomas Scruggs had an organic personality disorder, *i.e.*, changes to his personality due to an identifiable factor such as toxic, metabolic or head trauma. Dr. Schaerf believed that the near-miss incident was the cause of Thomas Scruggs' conditions.

64. However, Dr. Schaerf's diagnoses were based solely on Thomas Scruggs' statements about his history to Dr. Schaerf. Thomas Scruggs provided false information to Dr. Schaerf. Dr. Schaerf testified that a patient's false statements of his or her history makes it very difficult to establish a good basis for treatment.

65. Thomas Scruggs is not currently undergoing psychiatric treatment.

66. The physical injuries complained of and the damages alleged by Thomas Scruggs were not caused as a direct and proximate result of the near-miss incident. Indeed, Thomas Scruggs had pre-existing conditions and many of the alleged injuries were caused by age-related degeneration and the pre-existing conditions.

## CONCLUSIONS OF LAW

### A. Introduction

67. Plaintiffs bring this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*

68. Jurisdiction is proper pursuant to 28 U.S.C. § 1346(b).

69. Venue is proper pursuant to 28 U.S.C. § 1402(b).

70. Under the FTCA, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his or her employment under circumstances where the United States, if a private person, could be held responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

71. Accordingly, the state substantive law governs an action brought under the FTCA.

28 U.S.C. §§ 1346(b), 2674. Florida law governs the instant action.

■ 72. In a negligence action under Florida law, the plaintiff bears the burden of demonstrating by a preponderance of the evidence the following: (1) a legal duty owed to the plaintiff by the defendant; (2) breach of the duty by defendant; and (3) injury sustained as a proximate result of the breach. *Humphreys v. General Motors Corp.*, 839 F.Supp. 822, 829 (N.D.Fla.1993), *aff'd*, 47 F.3d 430 (11th Cir.1995); *Hensley v. United States*, 728 F.Supp. 716, 721–22 (S.D.Fla. 1989).

73. The ordinary rules of negligence and due care apply in an action arising out of the operation of an aircraft. *American Airlines, Inc. v. United States*, 418 F.2d 180, 191 (5th Cir.1969);[8] *Hensley*, 728 F.Supp. at 721.

74. Under Florida law, the standard of care is one of reasonable care, *i.e.*, that which a reasonably careful, prudent and cautious person would use under the circumstances. *Foster v. United States*, 858 F.Supp. 1157, 1162 (M.D.Fla.1994); *Nakajima v. United States*, 759 F.Supp. 1573, 1577 (S.D.Fla.1991), *aff'd in part. rev'd in part*, 965 F.2d 987 (11th Cir.1992) (quoting *Sergermeister v. Recreation Corp. of America*, 314 So.2d 626, 627 (Fla.Dist.Ct.App.1975), *cert. denied*, 328 So.2d 844 (Fla.1976)); *Hensley*, 728 F.Supp. at 721.

■ 75. To show proximate cause, the plaintiff must demonstrate that the defendant's alleged wrong caused the damage complained of. *Hensley*, 728 F.Supp. at 722. Further, "[t]here must be such a natural, direct and continuous sequence between the negligent act and the injury that it can reasonably be said that but for the act the injury would not have occurred." *Id.*

76. Florida has adopted a pure comparative negligence rule. *Nakajima*, 759 F.Supp. at 1581 (citing *Hoffman v. Jones*, 280 So.2d 431, 438 (Fla.1973)).

■ 77. Under the comparative negligence rule, if both the plaintiff and defendant

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

are at fault, the plaintiff can still recover, but his or her recovery is limited to the proportion of the damages that were proximately caused by the defendant's negligence. *Id.* (citing *Ganley v. United States,* 878 F.2d 1351 (11th Cir.1989)).

78. However, under Florida law, the comparative negligence rule:

> should not be construed so as to entitle a person to recover for damages in a case where the proof shows that the defendant could not by the exercise of due care have prevented the injury, or whether the defendant's negligence was not a legal cause of the damages. Stated differently, there can be no apportionment of negligence where the negligence of the defendant is not directly a legal cause of the result complained of by the plaintiff. A plaintiff is barred from recovering damages for loss or injury caused by the negligence of another only when the plaintiff's negligence is the sole legal cause of the damage, or the negligence of the plaintiff and some person or persons other than the defendant or defendants was the sole legal cause of the damage.

*Hoffman,* 280 So.2d at 438.

79. Therefore, a plaintiff is barred from recovering damages when the plaintiff's negligence is the sole legal cause of damages. *Id.*

**B. Negligence**

80. The first question in a negligence action is whether the defendant owed a legal duty to the plaintiff. *Navajo Circle, Inc. v. Development Concepts Corp.,* 373 So.2d 689, 691 (Fla.Dist.Ct.App.1979). If there has been no undertaking by the defendant for the plaintiff's benefit, then no duty exists absent a special relationship between the parties. *Mann v. Highland Ins. Co.,* 461 F.2d 541, 543 (5th Cir.1972).

81. The Court finds that the USAF did not undertake to provide traffic advisory services or aircraft vectoring services to civilian aircraft. Avon Park is not an air traffic control center. Avon Park, furthermore, does not have radar capability. Accordingly,

Avon Park personnel did not know the positions of the Mako Flight or Thomas Scruggs to anticipate that there was a potential conflict between the two aircraft.[9]

82. Thus, the USAF did not breach an actionable duty to Thomas Scruggs.

83. The FAA has promulgated Federal Aviation Regulations (FARs), Title 14 of the Code of Federal Regulations, and pilots operating aircrafts in the United States must obey the general operating and flight rules contained in the FARs. *United States v. Schultetus,* 277 F.2d 322 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960).

84. A pilot is responsible for and has the primary and ultimate responsibility for the operation of his or her aircraft. 14 C.F.R. § 91.3.

85. Each pilot must familiarize himself or herself with all available information concerning that flight. 14 C.F.R. § 91.103.

86. A pilot has a duty to remain vigilant throughout the flight; a pilot has a duty to observe, to recognize, and to avoid dangerous conditions which confront him or her. *Black v. United States,* 441 F.2d 741 (5th Cir.1971), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

87. Under VFR weather condition flight rules, the pilot has a duty to "see and avoid." That duty also requires that the pilot exercise the same degree of caution to visualize and avoid wake turbulence encounters with other aircraft. 14 C.F.R. § 91.113(b).

88. 14 C.F.R. § 91.113 provides, in pertinent part:

> (b) General. When weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft. When a rule of this section gives another aircraft the right-of-way, the pilot shall give way to that aircraft and may not pass

---

9. Thomas Scruggs testified that he did not expect Avon Park to provide him with any warning of the existence of military aircraft insofar as Avon Park is not an air traffic control agency and does not have radar capabilities.

over, under, or ahead of it unless well clear.

    \*      \*      \*      \*      \*      \*

(d) Converging. When aircraft of the same category are converging at approximately the same altitude (except head-on, or nearly so), the aircraft of the other's right has the right-of-way.

89. The Airman's Information Manual ("AIM") is a manual published by the Federal Aviation Administration ("FAA") and is "designed to provide airmen with basic flight information and ATC procedures for use in the National Airspace System (NAS) of the United States ... [The] manual contains the fundamentals required in order to fly in the U.S. NAS. It also contains items of interest to pilots concerning health and medical facts, factors affecting flight safety, a pilot/controller glossary of terms used in the Air Traffic Control System, and information on safety, accident and hazard reporting."

90. The AIM is evidence of the standard of care among pilots. *In re Air Crash Disaster at John F. Kennedy Int'l Airport,* 635 F.2d 67, 75–76 (2d Cir.1980).

91. The AIM provides information on special use airspace as follows:

**3–43. RESTRICTED AREA**

a. Restricted Areas contain airspace identified by an area on the surface of the earth within which the flight of aircraft, while not wholly prohibited, is subject to restrictions. Activities within these areas must be confined because of their nature or limitations imposed upon aircraft operations that are not a part of those activities or both. Restricted areas denote the existence of unusual, often invisible, hazards to aircraft such as artillery firing, aerial gunnery, or guided missiles ...

**3–45. MILITARY OPERATIONS AREAS (MOA)**

a. MOAs consist of airspace of defined vertical and lateral limits established for the purpose of separating certain military training activities from IFR traffic ...

b. Most training activities necessitate acrobatic or abrupt flight maneuvers. Military pilots conducting flight in Department of Defense aircraft within a designated and active military operations area (MOA) are exempted from the provisions of FAR 91.303(c) and (d) which prohibit acrobatic flight within Federal airways and control zones.

c. Pilots operating under VFR should exercise extreme caution while flying within a MOA when military activity is being conducted. The activity status (active/inactive) of MOA's may change frequently. Therefore, pilots should contact any FSS within 100 miles of the area to obtain accurate real-time information concerning the MOA hours of operation. Prior to entering an active MOA pilots should contact the controlling agency for traffic advisories.

92. The AIM includes a section on MTRs as follows:

**3–63. MILITARY TRAINING ROUTES (MTR)**

a. National security depends largely on the deterrent effect of our airborne military forces. To be proficient, the military services must train in a wide range of airborne tactics. One phase of this training involves "low level" combat tactics. The required maneuvers and high speeds are such that they may occasionally make the see-and-avoid aspect of VFR flight more difficult without increased vigilance in areas containing such operations. In an effort to ensure the greatest practical level of safety for all flight operations, the MTR program was conceived ...

c. Generally, MTRs are established below 10,000 feet MSL for operations at speeds in excess of 250 knots. However, route segments may be defined at higher altitudes for purposes of route continuity. For example, route segments may be defined for descent, climbout, and mountainous terrain. There are IFR and VFR routes as follows:

1. IFR Military Training Routes— IR: Operations on these routes are conducted in accordance with IFRs regardless of weather conditions.

2. VFR Military Training Routes— VR: operations on these routes are conducted in accordance with VFRs except, flight visibility shall be 5 miles or more; and flights shall not be con-

ducted below a ceiling of less than 3,000 feet AGL . . .

f. Nonparticipating aircraft are not prohibited from flying within an MTR; however, extreme vigilance should be exercised when conducting flight through or near these routes. Pilots should contact FSSs within 100 NM of a particular MTR to obtain current information or route usage in their vicinity. Information available include times of scheduled activity, altitudes in use on each route segment, and actual route width . . . When requesting MTR information, pilots should give the FSS their position, route of flight, and destination in order to reduce frequency congestion and permit the FSS specialist to identify the MTR routes which could be a factor.

93. Richard Lansing Cutshall ("Cutshall"), an airspace and operations manager, testified that a civilian pilot should plan his flight by getting a briefing from a flight service station or Miami Center on what is anticipated during the flight, to obtain NOTAMS, and to obtain information on weather conditions.

94. Lansing further testified that a civilian pilot should determine which MTRs are active and to find out where the military aircraft are. A civilian pilot would contact Miami Center to find out whether the military aircraft were operational.

95. Miami Center would know where the military aircraft are because the military aircraft are required to report to Miami Center at certain points along an IR.

96. A civilian aircraft can also request "flight following" from Miami Center. When a civilian aircraft requests "flight following," Miami Center will follow that aircraft, by radio or radar when possible, from the point of departure to final destination. Miami Center would provide information, such as the location of other aircraft in the vicinity and weather information, during the course of flight.

97. Therefore, Thomas Scruggs had a duty (1) to be aware of hazards of wake turbulence; (2) to be aware of the procedures for avoidance of wake turbulence; and (3) to obtain all available information concerning the flight, including information pertaining to the activity along the MTRs he would cross on his route of flight.

■ 98. Thomas Scruggs failed to operate his aircraft as a reasonably prudent pilot would have under the circumstances insofar as he (1) failed to obtain NOTAMs prior to departure in an effort to determine whether there would be military aircraft along his anticipated route; (2) failed to properly plan his flight and chose a route of flight (including altitude) that would place him within the confines of IR–34; (3) and engaged in a see and avoid procedure that was ineffective.

99. Indeed, the Court finds that the acts and omissions of Thomas Scruggs were the sole proximate cause of the near-miss incident and any damages he may have sustained as a result of the incident.

100. Where a plaintiff seeks to recover damages by reason of the defendant's negligence, the plaintiff must not only prove the extent of his or her injuries but also must prove that the injuries were proximately caused by the negligence of the defendant. *Chomont v. Ward,* 103 So.2d 635, 638 (Fla. 1958).

101. The defendant cannot be held liable for injuries that were not caused by his or her negligence. *Airstar, Inc. v. Gubbins,* 668 So.2d 311, 313 (Fla.Dist.Ct.App.1996).

■ 102. Many of Thomas Scruggs' conditions were caused by age-related degeneration, pre-existing conditions or factors unrelated to the near-miss incident.

103. Regardless of the near-miss incident, Thomas Scruggs would have had his pre-existing chronic degenerative spondylosis.

104. In addition, Thomas Scruggs has failed to prove by a preponderance of the evidence that any of his injuries were caused by the near-miss incident.

### C. Discretionary Function Exception

105. In addition to arguing that Avon Park personnel owed a duty to Thomas Scruggs and that the breach of that duty was the proximate cause of Thomas Scruggs' damages, Plaintiffs also seek recovery under alternate theories of negligence.

106. Specifically, Plaintiffs contend that Defendant was negligent insofar as it failed to adopt certain safety measures.

107. Plaintiffs' expert, Ira J. Rimson ("Rimson"), testified that it was his opinion that the USAF, in accepting a waiver of certain FAA regulations, undertook a duty to ensure a reasonable measure of safety. Rimson further testified that, in undertaking the duty, the USAF should or could have done the following: (1) established its own radar sight, either in conjunction with the FAA or independently; (2) installed a radar sight and donated it to the FAA to upgrade the FAA's capabilities; (3) established a communications base within the RCO structure; (4) installed a collision avoidance electronic system; or (5) established restricted areas which encompassed the MTRs.

108. The FTCA is a limited waiver of the government's sovereign immunity for certain claims sounding in tort. 28 U.S.C. § 1346(b); *McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

109. However, there are certain exceptions to the limited waiver of sovereign immunity such as the "discretionary function exception." 28 U.S.C. § 2680(a).

110. The discretionary function exception provides that the government shall not be liable for:

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

111. The discretionary function exception "marks the boundary between Congress' unwillingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984).

112. The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert,*

499 U.S. 315, 323, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765).

113. The question of whether the discretionary function exception is applicable for a particular claim requires a two-part analysis. First, the court must determine whether the activity at issue involved an element of judgment or choice; second, the court must determine whether that judgment was of the type the exception intended to protect. *Gaubert,* 499 U.S. at 322–23, 111 S.Ct. at 1273.

114. Plaintiffs' claims implicate the discretionary function exception.

115. When the plaintiff's allegations implicate the discretionary function exception, the plaintiff must identify a specific and mandatory statute or regulation which precludes discretion for the conduct alleged to be actionable. *Gaubert,* 499 U.S. at 324–25, 111 S.Ct. at 1274–75.

116. Plaintiffs have not identified any mandatory specific statutes, regulations or policy which stripped the government of the discretion it enjoys in its decisions pertaining to radar equipment site location and personnel training.

117. Further, decisions pertaining to expenditure of funds for radar sites and personnel training clearly involve the balancing of social, economic and political objectives and, thus, fall squarely within the protection of the discretionary function exception to the FTCA.

118. Based on the foregoing, the Court finds that the government is immune from suit under the discretionary function exception with respect to Plaintiffs' claim that the government was negligent for failing to implement certain safety measures.

## CONCLUSION

Accordingly, it is ORDERED AND ADJUDGED as follows:

1. Final Judgment is entered in favor of Defendant United States of America and against Plaintiffs Thomas Scruggs and Deborah Scruggs, his wife. The Court will enter

a separate final judgment in accordance with this Order.

2. All pending motions not otherwise ruled on are DENIED AS MOOT.

DONE AND ORDERED.